[No. S130860. Aug. 28, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
FERNANDO DOMINGUEZ, Defendant and Appellant.

**COUNSEL**

Dallas Sacher, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass and Gerald A. Engler, Assistant Attorneys General, Laurence K. Sullivan, Eric D. Share and John H. Deist, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WERDEGAR, J.**—We address in this case three separate claims of error. First, we consider whether the trial court erred when it failed to instruct the jury, sua sponte, that a reasonable yet mistaken belief the victim consented to have sexual intercourse was a defense to a charge of rape. (*People v. Mayberry* (1975) 15 Cal.3d 143 [125 Cal.Rptr. 745, 542 P.2d 1337].) Because defendant did not request such an instruction, rely on that defense, or present substantial evidence to support the defense, no duty to instruct arose and the Court of Appeal correctly so ruled.

Second, we revisit an area of criminal law in which recent Court of Appeal opinions suggest consistency has eluded the appellate courts: When is the forced movement, or asportation, of a victim sufficient to permit conviction of aggravated kidnapping? Contrary to the Court of Appeal, we conclude defendant's forced movement of the victim here was sufficient to satisfy the asportation requirement.

Finally, we once again address the circumstances in which a person who commits a serious felony can be liable for murder under the felony-murder rule when a coparticipant in the felony is the actual killer. (See *People v. Cavitt* (2004) 33 Cal.4th 187 [14 Cal.Rptr.3d 281, 91 P.3d 222]; *People v. Pulido* (1997) 15 Cal.4th 713 [63 Cal.Rptr.2d 625, 936 P.2d 1235].) As we explain, we conclude, contrary to the Court of Appeal, that any error in the trial court's failure in this case to instruct the jury on nonkiller liability under the felony-murder rule was harmless.

We therefore affirm in part and reverse in part the judgment below.

## FACTS

Early in the morning of August 23, 1997, Officer Edward Escamilla was on patrol in Hollister when he encountered victim Irma Perez sitting on the curb with two men; a third man wandered away from the group as Officer Escamilla approached. Perez appeared intoxicated, but the men did not. When he inquired about her condition, Perez replied she was fine and said they were waiting for a taxi. Officer Escamilla ran a warrant check on the two men, defendant Fernando Dominguez and Lionel Salcedo, but they were not subject to any outstanding warrants. Escamilla later saw defendant, Salcedo and Perez enter a taxi.

Rafael Gutierrez testified he drove a taxi and picked up the victim and three men in Hollister around 2:00 a.m. on August 23. He drove them to the San Benito labor camp, where two of the men exited the cab. When no one volunteered to pay the fare, Gutierrez started to drive back to town with the third man and Perez still in the cab. When the man said he would pay, Gutierrez stopped the cab and the man gave him $10. Perez got out of the taxi and began walking back to town, away from the labor camp. The man who had paid the fare (the third man) also got out and followed Perez. After pausing to write in his logbook, Gutierrez drove back to town, passing Perez on Southside Road. The third man had almost caught up to her. Gutierrez also saw one of the men who had exited his cab at the labor camp walking towards Perez from the direction of the camp.

Three days later, an agricultural worker discovered Perez's body in a shallow grave in a walnut orchard about 250 feet from Southside Road. Police observed drag marks in the dirt leading from a spot near the roadway to the location where the body was found. Sergeant Stephens testified he observed two sets of shoe prints alongside the drag marks, suggesting two people had dragged the victim into the orchard where she eventually was found. The victim was naked from the waist down, her brassiere was pulled up over her chest, and another piece of clothing was wrapped around her neck. Further investigation revealed her jeans and underpants had been buried in another part of the walnut grove, at the bottom of an embankment near Southside Road. Police also found her shoes in the orchard.

On learning the victim had been seen at the Smokehouse Bar in Hollister with defendant, Jose Martinez and Lionel Salcedo the night of August 22–23, police went to the labor camp where defendant and Martinez lived, only to find they had left that day and not returned. Police located the two late that night, walking on a rural road. Defendant initially gave police a false name; he later admitted his identity but denied knowing anything about Perez. He subsequently changed his story and admitted he had been with Perez the night in question but denied having sex with her or knowing anything about her death.

Forensic evidence determined Perez had been beaten and choked to death and that she had been forcibly raped, causing substantial bruising to her posterior vaginal wall and cervix. Police determined that semen found in her vagina came from two different donors. A DNA analysis identified one donor as Carlos Quesada, the father of her children, with whom she was living at the time, and the other as defendant. Martinez was excluded as a possible donor. Quesada testified he and Perez had engaged in consensual sex the morning preceding her murder.

Martinez died of natural causes before trial. Defendant testified in his own defense. He claimed he had had consensual sex with Perez before leaving her with Martinez. He specifically denied raping or killing her. The jury convicted defendant of murder (Pen. Code, § 187),[1] kidnapping for rape (former § 208, subd. (d), now § 209, subd. (b)) and rape (§ 261, subd. (a)(2)). The Court of Appeal affirmed the conviction for rape but reversed the kidnapping and murder convictions. We granted the People's petition for review.

---

[1] All subsequent statutory references are to the Penal Code.

## DISCUSSION

### I. *The Jury Was Properly Instructed on Rape*[2]

Defendant contends the trial court erred by failing to instruct the jury, even in the absence of a request, that a reasonable though mistaken belief in consent was a defense to a charge of rape, the so-called *Mayberry* instruction. (*People v. Mayberry, supra,* 15 Cal.3d 143 [125 Cal.Rptr. 745] (*Mayberry*).) Applying settled principles of law, we find no error because defendant neither relied on a *Mayberry* defense nor presented substantial evidence to support one. His defense was solely one of consent in fact.

### A.

Defendant testified he and Perez got out of the taxi and began walking down Southside Road. As they walked and conversed, he told Perez he wanted to have sex with her. She at first declined, saying she did not know him, but she eventually relented, and the two had sex by the side of the road. Defendant testified he did not force her; she engaged in intercourse of her own free will. The forensic evidence, however, showed that before her death Perez suffered significant bruising of her vaginal walls and cervix. In addition, police found blood on her jeans.

Defense counsel did not request that the court give CALJIC No. 10.65,[3] the *Mayberry* instruction, or its equivalent,[4] and no such instruction was given.

---

[2] When we granted the People's petition for review, we also directed the parties to address this issue, raised in defendant's answer to the petition: "Did the trial court have a sua sponte duty to instruct the jury pursuant to *People v. Mayberry*[, *supra*,] 15 Cal.3d 143, concerning a reasonable and bona fide belief in the victim's consent to engage in sexual intercourse?"

[3] At the time, CALJIC No. 10.65 stated in pertinent part: "In the crime of unlawful [forcible rape] . . . , criminal intent must exist at the time of the commission of the [rape].

"There is no criminal intent if the defendant had a reasonable and good faith belief that the other person voluntarily consented to engage in [sexual intercourse]. . . . Therefore, a reasonable and good faith belief that there was voluntary consent is a defense to such a charge. [¶] . . . [¶]

"However, a belief that is based upon ambiguous conduct by an alleged victim that is the product of conduct by the defendant that amounts to force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person of the alleged victim or another is not a reasonable good faith belief.

"If after a consideration of all of the evidence you have a reasonable doubt that the defendant had criminal intent at the time of the accused sexual activity, you must find him not guilty of the crime."

[4] For example, the final paragraph of Judicial Council of California Criminal Jury Instructions (2006) CALCRIM No. 1000 provides: "The defendant is not guilty of rape if he actually and reasonably believed that the woman consented to the intercourse. The People have the

## B.

 In the absence of a request for a particular instruction, a trial court's obligation to instruct on a particular defense arises " 'only if [1] it appears that the defendant is relying on such a defense, or [2] if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " (*People v. Barton* (1995) 12 Cal.4th 186, 195 [47 Cal.Rptr.2d 569, 906 P.2d 531]; see also *People v. Maury* (2003) 30 Cal.4th 342, 424 [133 Cal.Rptr.2d 561, 68 P.3d 1].)

Defendant can satisfy neither prong of this test. At trial, he testified that after some initial hesitation, Perez consented to have sex with him and the ensuing act was consensual and voluntary. In closing argument, defense counsel argued defendant "had voluntary sex with this lady" and that, considering all the circumstances, the jury should conclude the victim consented to have sex. The defense presented no evidence suggesting the victim had refused to consent but defendant reasonably believed she had consented, nor did defense counsel present any argument relying on this theory. Accordingly, we conclude defendant did not rely on a *Mayberry* defense at trial.

 Defendant also fails the second prong of the test because the evidence supportive of a *Mayberry* defense was insubstantial at best. As we explained in *People v. Williams* (1992) 4 Cal.4th 354 [14 Cal.Rptr.2d 441, 841 P.2d 961], the *Mayberry* defense "has two components, one subjective, and one objective. The subjective component asks whether the defendant honestly and in good faith, albeit mistakenly, believed that the victim consented to sexual intercourse. In order to satisfy this component, a defendant must adduce evidence of the victim's equivocal conduct on the basis of which he erroneously believed there was consent. [¶] In addition, the defendant must satisfy the objective component, which asks whether the defendant's mistake regarding consent was reasonable under the circumstances. Thus, regardless of how strongly a defendant may subjectively believe a person has consented to sexual intercourse, that belief must be formed under circumstances society will tolerate as reasonable in order for the defendant to have adduced substantial evidence giving rise to a *Mayberry* instruction." (*Id.* at pp. 360–361, fn. omitted.) The right to a *Mayberry* instruction in the absence of a request thus depends on whether the defendant has proffered "substantial evidence that the defendant honestly and reasonably, but mistakenly, believed that the victim consented to sexual intercourse." (*Id.* at p. 361.)

burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the woman consented. If the People have not met this burden, you must find the defendant not guilty."

In this case, defendant presented no evidence he *mistakenly* believed Perez consented to have sex. Instead, he testified she had *in fact* consented. Perez of course could not testify, but the evidence she was killed after engaging in sexual intercourse and that she was beaten and strangled and suffered severe trauma to her vagina and cervix suggests she resisted rather than consented. As in *Williams*, these contrasting scenarios "create no middle ground from which [defendant] could argue he reasonably misinterpreted [the victim's] conduct." (*People v. Williams, supra,* 4 Cal.4th at p. 362.)

*People v. May* (1989) 213 Cal.App.3d 118 [261 Cal.Rptr. 502], on which defendant relies, is distinguishable. In that case, the defendant and the victim told conflicting stories regarding consent, but there was also evidence suggesting some equivocal behavior by the victim on the question of consent. Defendant's evidence, by contrast, did not indicate the kind of equivocal behavior from which a reasonable person could have concluded the victim had consented to have sexual intercourse when she in fact had not. The most that could be said for defendant's testimony, if credited, is that the victim actually consented, not that he mistakenly believed she had done so. Accordingly, there being no evidence defendant relied on a mistake-of-fact defense nor any substantial evidence to support such a defense (*People v. Maury, supra,* 30 Cal.4th at p. 424), the trial court did not err by failing to instruct the jury, sua sponte, with the *Mayberry* mistake-of-fact instruction.

## II. *The Evidence of Asportation Was Sufficient*

We once again address the question of when evidence of forced movement of a victim is sufficient to satisfy the statutory requirement of asportation, a critical element of the crime of aggravated kidnapping. In this case, the Court of Appeal concluded the evidence of asportation was insufficient to support the conviction of kidnapping for rape. (Former § 208, subd. (d), now § 209, subd. (b).) We disagree and instead find a reasonable jury could have concluded the evidence of asportation was sufficient.

### A.

At the time of defendant's conviction, the crime of kidnapping for the purpose of rape was set forth in former section 208, subdivision (d) (former section 208(d)). That statute provided: "If [a] person is kidnapped with the intent to commit rape . . . , the kidnapping is punishable by imprisonment in the state prison for 5, 8, or 11 years." (Stats. 1992, ch. 163, § 101, p. 781.)

Concerned in *People v. Daniels* (1969) 71 Cal.2d 1119 [80 Cal.Rptr. 897, 459 P.2d 225] (*Daniels*) that the " 'criminologically nonsignificant circumstance that the victim [of a robbery] was detained or moved *incident to* the

crime' " resulted in a much harsher penalty (*id.* at p. 1138), we held that the Legislature, in creating the crime of aggravated kidnapping (at that time, kidnapping for ransom, reward, extortion or robbery), intended to exclude those situations in which the movement of a robbery victim was "merely incidental to the commission of the robbery and [did] not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself" (*id.* at p. 1139).

▇ The crime of aggravated kidnapping was enlarged in 1990 to include kidnapping for enumerated sex crimes. (Stats. 1990, ch. 1560, § 1, p. 7329.) In 1994, we held the *Daniels* test for asportation applied to kidnapping for rape under former section 208(d). (*People v. Rayford* (1994) 9 Cal.4th 1 [36 Cal.Rptr.2d 317, 884 P.2d 1369] (*Rayford*).) Thus, "the standard of asportation for [former] section 208(d) kidnapping requires that the movement of the victim be for a distance which is more than that which is merely incidental to the commission or attempted commission of rape . . . , and that this movement substantially increase the risk of harm to the victim over and above that necessarily present in the commission or attempted commission of these crimes." (*Id.* at p. 22.)[5]

The People's theory of the present case, as reflected in the prosecutor's argument to the jury, was that defendant followed the victim after she got out of the taxi and, with the intent to rape her, forced her from the side of Southside Road, down an embankment and into an orchard. Once there, he (possibly with Martinez's assistance) raped and killed her, burying her jeans and discarding her shoes at the scene before dragging her lifeless body further into the walnut orchard and burying her. An investigating officer testified the drop from the surface of Southside Road to where the victim's bloody jeans were buried was approximately 10 to 12 feet, down a "fairly steep" hill. This place, which is where the prosecutor argued the rape occurred, was about 25 feet from the road.

The prosecutor argued in closing: "We know where her clothes were found. We know where her body was located. Dominguez had to take her down . . . 10 or 12 feet down. He took her off the road. . . . [¶] . . . The movement was for a substantial distance more than that being slight or trivial, meaning a

---

[5] After defendant committed his crime, the crime of kidnapping for purpose of rape was moved to section 209, subdivision (b) (section 209(b)). Section 209(b) now provides: "(1) Any person who kidnaps or carries away any individual to commit . . . rape . . . shall be punished by imprisonment in the state prison for life with possibility of parole. [¶] (2) This subdivision shall only apply if the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense."

As defendant's offense predated the amendment of section 209(b) and neither party has addressed the asportation requirement under that section, we express no view on that subject.

couple of feet. Something like that. It's more. It's substantial, because it was into an orchard and down a 12-foot embankment. [¶] Now, the movement substantially increased the risk of harm over and above that necessarily present in the crime of rape itself. Well, why is that and how is that? Well, he took her into an orchard, down a gully. No cars could see her. Into the orchard in the rural part of the county that is clearly secluded."

The jury was instructed that, for a violation of former section 208(d), it must find defendant kidnapped the victim with the specific intent to rape her[6] and that "[k]idnapping is the unlawful movement by physical force of a person without that person's consent for a substantial distance where the movement is not merely incidental to the commission of the rape and where the movement substantially increases the risk of harm to the person over and above that necessarily present in the crime of rape itself."

The jury was also instructed that "[b]rief movements to facilitate the crime of rape are incidental to the commission of the rape; on the other hand, movements to facilitate the rape that are for a substantial distance rather than brief [movements] . . . are not incidental to the commission of the rape." The distance moved must be "more than slight, brief or trivial."

**B.**

For purposes of the appeal, defendant concedes substantial evidence shows he forced the victim against her will to move from along the shoulder of Southside Road down an embankment and partially into a walnut orchard, approximately 25 feet away from the road and 10 to 12 feet below its surface. He disputes, however, that this forced movement was for a distance greater than that which was merely incidental to the commission of the rape and that the movement substantially increased the risk of harm to the victim, as required by former section 208(d).

Whether a forced movement of a rape victim (or intended rape victim) was merely incidental to the rape, and whether the movement substantially increased the risk of harm to the victim, is difficult to capture in a simple verbal formulation that would apply to all cases. We discussed the standard in *Rayford* and explained that the jury must "consider[] the '*scope and nature*' of the movement," as well as "*the context of the environment in which the movement occurred.*" (*Rayford, supra,* 9 Cal.4th at p. 12, italics added; see *People v. Aguilar* (2004) 120 Cal.App.4th 1044, 1051 [16 Cal.Rptr.3d 231]

---

[6] Although rape is a general intent crime (*People v. Jones* (2003) 29 Cal.4th 1229, 1256 [131 Cal.Rptr.2d 468, 64 P.3d 762]), aggravated kidnapping by definition requires proof of specific intent.

[emphasizing the context of the movement].) This standard suggests a multifaceted, qualitative evaluation rather than a simple quantitative assessment. Moreover, whether the victim's forced movement was merely incidental to the rape is necessarily connected to whether it substantially increased the risk to the victim. "These two aspects are not mutually exclusive, but interrelated." (*Rayford*, at p. 12.)

■ The essence of aggravated kidnapping is the increase in the risk of harm to the victim caused by the forced movement. (*Rayford, supra*, 9 Cal.4th at p. 22.) We have articulated various circumstances the jury should consider, such as whether the movement decreases the likelihood of detection, increases the danger inherent in a victim's foreseeable attempts to escape, or enhances the attacker's opportunity to commit additional crimes. (*Id.* at p. 13.) In finding insufficient evidence of asportation, the Court of Appeal below focused too narrowly on a subsidiary aspect of the analysis, measured distance, rather than considering how all the attendant circumstances related to the ultimate question of increased risk of harm. Although any assessment of the *Daniels/Rayford* test necessarily must include a consideration of the actual distance the victim was forced to move (*Rayford, supra*, 9 Cal.4th at p. 12), we have repeatedly stated no minimum distance is required to satisfy the asportation requirement (*ibid.*), so long as the movement is substantial (*id.* at p. 23).

Measured distance, therefore, is a relevant factor, but one that must be considered in context, including the nature of the crime and its environment. In some cases a shorter distance may suffice in the presence of other factors, while in others a longer distance, in the absence of other circumstances, may be found insufficient. For example, moving robbery victims between six and 30 feet within their home or apartment (see *Daniels, supra*, 71 Cal.2d at pp. 1123–1124) or 15 feet from the teller area of a bank to its vault (*People v. Washington* (2005) 127 Cal.App.4th 290, 299 [25 Cal.Rptr.3d 459]) may be viewed as merely incidental to the commission of the robbery and thus insufficient to satisfy the asportation requirement of aggravated kidnapping. Yet, dragging a store clerk nine feet from the front counter of a store to a small back room for the purpose of raping her (see *People v. Shadden* (2001) 93 Cal.App.4th 164, 167 [112 Cal.Rptr.2d 826]) or forcibly moving a robbery victim 40 feet within a parking lot into a car (see *People v. Jones* (1999) 75 Cal.App.4th 616, 629 [89 Cal.Rptr.2d 485]) might, under the circumstances, substantially increase the risk of harm to the victim and thus satisfy the asportation requirement. These examples are illustrative only; each case must be considered in the context of the totality of its circumstances.

Robberies and sex crimes, the necessary predicates for an aggravated kidnapping (see § 209), can of course be committed in a variety of ways. To

catalog all the myriad and various possible aspects of such crimes would be impossible. But beginning with the template established in *Daniels, supra*, 71 Cal.2d 1139, prohibiting increased liability for aggravated kidnapping for what are essentially brief and trivial movements in "standstill" robberies or for movements "merely incidental" to commission of the offense, through *Rayford, supra*, 9 Cal.4th 1, the applicable test under former section 208(d) is clear: for aggravated kidnapping, the victim must be forced to move a *substantial distance*, the movement cannot be merely *incidental* to the target crime, and the movement must *substantially increase* the risk of harm to the victim. Application of these factors in any given case will necessarily depend on the particular facts and context of the case.

Because the jury was properly instructed on these factors, we turn to an evaluation whether sufficient evidence supports the jury's verdict. We reiterate the standard rule of appellate review: "In determining whether a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt, the appellate court 'must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citations.] The court does not, however, limit its review to the evidence favorable to the respondent. As *People* v. *Bassett* [(1968)] 69 Cal.2d 122 [70 Cal.Rptr. 193, 443 P.2d 777], explained, 'our task . . . is twofold. First, we must resolve the issue in the light of the *whole record*—i.e., the entire picture of the defendant put before the jury—and may not limit our appraisal to isolated bits of evidence selected by the respondent. Second, we must judge whether the evidence of each of the essential elements . . . is *substantial*; it is not enough for the respondent simply to point to "some" evidence supporting the finding, for "Not every surface conflict of evidence remains substantial in the light of other facts." ' " (*People v. Johnson* (1980) 26 Cal.3d 557, 576–577 [162 Cal.Rptr. 431, 606 P.2d 738].)

Applying the foregoing principles, we find substantial evidence supports the jury's verdict sustaining charges of aggravated kidnapping. Defendant forced the victim in the middle of the night from the side of the road to a spot in an orchard 25 feet away and 10 to 12 feet below the level of the road. Though the distance is not great, an aerial photograph of the scene confirms the victim was moved to a location where it was unlikely any passing driver would see her. Not only was the place to which she was moved substantially below the road—one witness testified it was a down a "fairly steep" hill—it was within an orchard where the trees would also have tended to obscure defendant's crime from any onlookers. The movement thus changed the victim's environment from a relatively open area alongside the road to a place significantly more secluded, substantially decreasing the possibility of detection, escape or rescue. This case is thus unlike the brief and trivial movements of the robbery victims around a room, as in *Daniels, supra*, 71

Cal.2d 1119, or of a robbery victim from the teller area of a bank to a back room where the vault was located, as in *People v. Washington, supra,* 127 Cal.App.4th 290, movements found to be merely incidental to commission of the offense. Here, defendant's movement of the victim down an embankment and into an orchard cannot be said to have been merely incidental to the rape.

*People v. Stanworth* (1974) 11 Cal.3d 588 [114 Cal.Rptr. 250, 522 P.2d 1058] (*Stanworth*), on which the Court of Appeal relied, also is distinguishable.[7] In that case, the victim was walking home from a shopping center when the defendant accosted her, threatened her with an ice pick, and forcibly moved her 25 feet into an open field where he bound, raped and robbed her. We reversed the defendant's conviction of kidnapping for robbery, noting the distance the victim was moved was similar to the distances we found incidental in *Daniels, supra,* 71 Cal.2d 1119. (*Stanworth,* at pp. 597–598.) We explained that "there is no evidence that the relatively brief movement of the victim here removed her from public view or in any other manner substantially increased the risk, beyond that inherent in the underlying crimes, that she would suffer physical harm." (*Id.* at p. 598.) Here, unlike *Stanworth,* defendant's forced movement of Perez in fact removed her from public view and substantially increased her risk of harm.

The Court of Appeal found it significant that the victim "was not forced into an enclosure which concealed her from public view," but a forced movement need not be into an "enclosure" to effect a substantial increase in the risk of harm. Moreover, a reasonable jury could have concluded that the place to which the victim was moved was in fact one obscured from public view. Although the Court of Appeal reasoned that there was "a clear line of sight to the top of the embankment . . . suggesting that anyone standing by the road would have had a clear view of the spot" where the rape occurred, a reasonable jury could have concluded, based on all the evidence, including the time of night and the isolated environment, that any passerby would likely be in a car, not on foot, and would not likely stop to look down the embankment into the orchard.

Defendant argues the evidence of asportation was insufficient because it showed the victim was moved less than 90 feet. He maintains that, at the time of his crime, simple kidnapping required a movement of more than 90 feet, and because simple kidnapping was a lesser included offense of aggravated kidnapping, kidnapping for rape must have required a movement of more than 90 feet. We reject defendant's simple syllogism because its premise fails. At the time of defendant's crime, it was not well established that *under all*

---

[7] *Stanworth's* discussion of the asportation standard for *simple* kidnapping was disapproved in part in *People v. Martinez* (1999) 20 Cal.4th 225, 233–235 [83 Cal.Rptr.2d 533, 973 P.2d 512].

*circumstances* simple kidnapping required a movement of more than 90 feet. Although this court found in *People v. Green* (1980) 27 Cal.3d 1, 65–67 [164 Cal.Rptr. 1, 609 P.2d 468], that a victim's movement of 90 feet was insufficient to constitute a simple kidnapping,[8] we later explained in *Rayford, supra,* 9 Cal.4th at page 14, albeit in dictum, that "we have resisted setting a specific number of feet as the required minimum distance [for simple kidnapping], and have further required that the movement must be 'substantial in character.' " (See also *Stanworth, supra,* 11 Cal.3d 588, 601 [rejecting a test involving a specific number of feet].) We thus reject this claim.

█ In sum, considering the context of the forced movement of the victim here and viewing the evidence in the light most favorable to the People, we conclude there was sufficient evidence of asportation; that is, the movement in this case was "for a distance which is more than that which is merely incidental to the commission . . . of rape . . . , and that this movement substantially increase[d] the risk of harm to the victim over and above that necessarily present in the commission [of rape]." (*Rayford, supra,* 9 Cal.4th at p. 22.)

III. *Failure to Instruct on Nonkiller Complicity Under the Felony-murder Rule*

Defendant contended on appeal that the trial court prejudicially erred by failing to instruct the jury, sua sponte, on the liability of nonkillers in a felony-murder situation. The Court of Appeal agreed, finding the instructional error prejudicial. As we explain, even assuming for argument the trial court erred by failing to instruct the jury, the error was harmless.

**A.**

The People's theory of the case was that defendant personally raped and killed Perez, although Martinez may have been present for the rape and probably participated in the murder. Thus, the prosecutor presented evidence that defendant and Martinez lived together in the San Benito labor camp; Perez was seen leaving a bar in the early morning hours with defendant, Martinez and Salcedo; a taxi dropped the four of them off near the labor camp where defendant and Martinez lived; and defendant walked down Southside Road toward Perez, with Martinez close behind. Tests on seminal fluid found inside Perez's body identified defendant as the donor and

---

[8] We rejected this portion of *People v. Green* in *People v. Martinez, supra,* 20 Cal.4th at pages 233–237, where we disavowed that any fixed minimum distance applied to simple kidnapping. In addition, *People v. Green* was overruled on other grounds in *People v. Hall* (1986) 41 Cal.3d 826, 834, footnote 3 [226 Cal.Rptr. 112, 718 P.2d 99].

excluded Martinez. The People presented evidence showing Perez had sustained substantial bruising of her genitals indicating significant force had been applied, that those injuries were inflicted before death, and that she had been beaten and strangled. Footprint evidence suggested two persons had dragged Perez to her shallow grave in the walnut orchard. When apprehended, both defendant and Martinez appeared to be fleeing. Defendant told police conflicting stories about the events in question.

In closing argument, the prosecutor argued defendant personally participated in Perez's killing; that the jury could infer defendant's guilt from his multiple lies to police, whereas Martinez did not lie to police; that defendant was the one who had sex with Perez, as shown by the DNA evidence; that the evidence of bruising showed a forcible sex act; and that, after the rape, both defendant and Martinez beat Perez and then dragged her into the orchard and buried her.

The trial court instructed the jury with CALJIC Nos. 8.10 and 8.21, defining first degree felony murder. The first instruction provided that: "The defendant is accused in Count 1 of the information of having committed the crime of murder in violation of Penal Code section 187. Every person who unlawfully kills a human being during the commission or attempted commission of rape is guilty of the crime of murder in violation of section 187 of the Penal Code." The second instruction provided that: "In order to prove this crime, each of the following elements must be proved: [¶] The human being was killed and the killing occurred during the commission or the attempted commission of the crime of rape. The unlawful killing of a human being, whether intentional or unintentional or accidental which occurred during the commission or attempted commission of the crime of rape is murder in the first degree when the perpetrator had a specific intent to commit the crime. Specific intent to commit rape and the commission or attempted commission of such crime must be proved beyond a reasonable doubt."

Defendant requested aiding and abetting instructions as well as CALJIC No. 8.27, which addresses the felony-murder liability of offenders who aid and abet in the felony but do not participate in the killing, but for reasons not apparent in the record, these instructions were not given. At the conclusion of its instructions, the trial court asked: "Counsel, do you agree that I have read all the instructions that we agreed upon?" Both the prosecutor and defense counsel answered in the affirmative.

The jury retired to deliberate at 4:30 p.m. on January 29, 2001, but was excused 15 minutes later. It resumed deliberations the next day. At 4:01 p.m.,

the jury sent the trial court a note[9] stating: "We are unclear of the criteria of the statute. To find Dominguez guilty of felony murder (187). Did Dominguez only need to be present at the time of [Perez's] death, or did he need to kill her himself[?] We are clear about the rape element of the crime." The trial court responded with a handwritten note, stating: "I cannot offer anything more than the wording of [instructions] 8.10 and 8.21 which I previously read." Nothing in the record suggests the trial court consulted with counsel before responding to the jury's note. The jury returned its guilty verdicts almost immediately thereafter.

At the sentencing hearing, defense counsel moved to preserve the jury's notes in the record. After promising to have the clerk locate the notes, the following colloquy occurred:

"MR. HOWELL [defense counsel]: . . . I believe that one of the last notes, the tenor of the note was that if the jury found that Mr. Dominguez was present at the time of the killing, could that be a basis for a guilty verdict?

"THE COURT: And the Court answered that by merely referring back to the instruction, the number, that defined that crime. And we made no comment directly to the question. [¶] Is that the way you remember it, Mr. LaForge?

"MR. LaFORGE [the prosecutor]: That's correct, your Honor.

"THE COURT: So I think the answer is the Court merely made a notation, Please read instruction such and such—

"MR. HOWELL: Right.

"THE COURT:—which states the law.

"MR. HOWELL: So the Court and counsel do remember the note as I do, that it was to the effect, Can we find him guilty if he was present—

"THE COURT: Right.

"MR. HOWELL:—during the homicide?

"THE COURT: Right. And we felt that we didn't want to comment directly on that point. And the law is very clear, that he has to do an act, as the instruction read.

---

[9] The jury sent out two other notes during deliberations, but neither is relevant to the inquiry before us.

"MR. HOWELL: All right."

Defendant did not raise the alleged instructional error, or claim the trial court's response to the jury's note was improper, in a motion for a new trial.

**B.**

██ Defendant argued on appeal that the trial court erred by failing to give CALJIC No. 8.27, especially once the jury expressed confusion concerning the liability of nonkiller aiders and abettors to a felony murder. A trial court "is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request." (*People v. Blair* (2005) 36 Cal.4th 686, 744 [31 Cal.Rptr.3d 485, 115 P.3d 1145].) The trial court initially fulfilled this obligation by instructing the jury with the standard felony-murder instructions. Because the People proceeded on a theory that defendant was the actual rapist and killer, not an aider and abettor, and defendant's defense was that he had consensual sex with the victim before leaving her alive with Martinez, the court had no obligation to give CALJIC No. 8.27, or its equivalent (see, e.g., CALCRIM No. 540B), as an initial matter.

Did an obligation to provide further instructions arise when the jury sought additional guidance? The jury asked the court for advice concerning whether defendant could be convicted of murder on a felony-murder theory when he was not the actual killer. The trial court gave the jury no additional guidance but merely referred it back to instructions the court had already given, instructions that did not address an aider and abettor's liability for murder under the felony-murder rule if he participated only in the underlying felony.

We need not resolve whether the trial court was remiss, for the People concede for purposes of this appeal that the trial court erred by failing, after the jury's question, to instruct the jury on nonkiller liability for felony murder. We thus turn to whether this assumed error requires reversal.

**C.**

██ We recently addressed the liability of nonkillers under the felony-murder rule in *People v. Cavitt, supra,* 33 Cal.4th 187 (*Cavitt*). We there explained that section 189 renders all murders committed in the perpetration of, or attempted perpetration of, certain enumerated felonies, including rape and kidnapping, murder in the first degree. "The mental state required is simply the specific intent to commit the underlying felony [citation], since

only those felonies that are inherently dangerous to life or pose a significant prospect of violence are enumerated in the statute. [Citations.] 'Once a person has embarked upon a course of conduct for one of the enumerated felonious purposes, he comes directly within a clear legislative warning—if a death results from his commission of that felony it will be first degree murder, regardless of the circumstances.'

■ "The purpose of the felony-murder rule is to deter those who commit the enumerated felonies from killing by holding them strictly responsible for any killing *committed by a cofelon*, whether intentional, negligent, or accidental, during the perpetration or attempted perpetration of the felony. [Citation.] 'The Legislature has said in effect that this deterrent purpose outweighs the normal legislative policy of examining the individual state of mind of each person causing an unlawful killing to determine whether the killing was with or without malice, deliberate or accidental, and calibrating our treatment of the person accordingly. Once a person perpetrates or attempts to perpetrate one of the enumerated felonies, then in the judgment of the Legislature, he is no longer entitled to such fine judicial calibration, but will be deemed guilty of first degree murder for any homicide committed in the course thereof.' " (*Cavitt, supra,* 33 Cal.4th at p. 197, italics added.)

■ Liability for felony murder thus extends to those who knowingly and purposefully participate in the underlying felony even if they take no part in the actual killing. This was the scenario about which defendant's jury inquired. At the time of his trial, CALJIC No. 8.27 stated in pertinent part: "If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of [rape], all persons, *who either directly and actively commit the act* constituting that crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, *aid, promote, encourage, or instigate by act or advice its commission,* are guilty of murder of the first degree, whether the killing is intentional, unintentional, or accidental." (Italics added; see *People v. Pulido, supra,* 15 Cal.4th at p. 728.)

Had the trial court given CALJIC No. 8.27 in response to the jury's question, the jury would have been apprised of the law regarding nonkiller complicity in the felony-murder context. Not having been instructed with CALJIC No. 8.27 or its equivalent, the jury was never specifically asked with respect to the murder to find that defendant either (1) "directly and actively" participated in the rape of Perez, or (2) with knowledge of Martinez's unlawful purpose to rape her, and with the intent or purpose of committing, encouraging or facilitating the rape, aided, promoted, encouraged or instigated by act or advice the commission of that rape.

We need not determine whether omission of the instruction in these circumstances is merely state law error subject to the *Watson* test (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]), or error of constitutional dimension subject to the stricter harmless beyond a reasonable doubt test (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]), for we find the assumed error was harmless under any standard. The circumstances of this case show that, on proper instructions, the jury found defendant kidnapped the victim and forcibly raped her. The evidence demonstrated the victim was beaten before she was raped. The evidence also showed she was killed the night she was raped, on or near the spot where defendant kidnapped and raped her. Footprint evidence suggested two persons dragged the victim from the embankment next to the road into the orchard, where her body was eventually found. Finally, it was uncontradicted that defendant and Martinez fled their home in the labor camp immediately after the victim's body was discovered, and that defendant told several lies to police when questioned.

Judging from the jury's question, one or more jurors may have been considering the possibility that following defendant's commission of the kidnapping and rape, Martinez alone killed the victim while defendant merely looked on. But in convicting defendant of rape and kidnapping, the jury indicated it had concluded beyond a reasonable doubt that defendant "directly and actively" participated in the rape of Perez. Accordingly, even had the trial court instructed the jury with CALJIC No. 8.27 in response to its question, the jury would necessarily have concluded defendant was liable for murder, either as the direct perpetrator or under the felony-murder rule applicable to nonkilling cofelons. Although the Court of Appeal reasoned the jury could have found a temporal or causal connection lacking between the rape and the homicide (see *Cavitt, supra,* 33 Cal.4th at pp. 196, 200), we disagree. As the foregoing evidence demonstrates, this is not one of those rare situations (*id.* at p. 204, fn. 5) in which a felony and a killing, though occurring in a continuous transaction, lack a causal connection.

Moreover, although the jury's note suggests the jury (or perhaps just one juror) was considering the possibility defendant did not actively participate in the victim's murder but was merely present at her violent demise, "mere presence" is not exculpatory in the circumstances of this case. Although a decision not to participate actively in the murder might in the abstract evince some degree of reduced moral responsibility, defendant, following his kidnapping and forcible rape of the victim, was " 'no longer entitled to such fine judicial calibration' " of his criminal liability. (*Cavitt, supra,* 33 Cal.4th at p. 197.)

Defendant cites *People v. Gavin* (1971) 21 Cal.App.3d 408 [98 Cal.Rptr. 518] (*Gavin*) in support, but that case does not assist him. In *Gavin*, the People presented evidence that a neighbor bought tablets of LSD and Benzedrine at the defendant's home on or about October 25, 1969. The defendant testified and denied knowing about those drugs, but she admitted to a different story: On September 27, 1969, she discovered her housemate Bryan possessed several types of drugs (but no LSD) in her home and that Bryan had used her young son to facilitate some drug sales. When Bryan was absent from the house for several weeks, she gathered up his drugs, buried them in the backyard, and called the sheriff's department because " '[s]ome-body who would give dope to kids shouldn't be allowed to be out on the street' and she 'wanted something to be done.' " (*Id.* at p. 416.)

The prosecution relied on the October 25 drug possession as the basis for the charges. During its deliberations, the jury expressed confusion and asked whether the September 27 possession (which the defendant had admitted) could qualify as "on or about" October 25. In answering the jury's question, the trial court did not clarify whether the September 27 possession could qualify as "on or about" October 25. On appeal following the defendant's conviction for possessing amphetamines (but not LSD), the Court of Appeal reversed, explaining that "[t]he [trial] court's failure to clear up the jury's confusion regarding the September 27 'possession' was fundamentally unfair to the defendant." (*Gavin, supra,* 21 Cal.App.3d at p. 418.) "The simple and proper solution would have been for the court to tell the jury directly that the People's evidence had been offered to prove that defendant unlawfully possessed drugs on October 24 and 25, 1969; and defendant was not charged with possession on any other date." (*Ibid.*)

Although in both *Gavin, supra,* 21 Cal.App.3d 408, and the instant case the jury expressed some confusion and asked a question which in *Gavin* the trial court answered inadequately as, arguably, did the trial court here, the similarity between the two cases ends there. In *Gavin*, the jury apparently was choosing between two options, only one of which would have supported the criminal charges. Here, by contrast, the jury was deciding between two scenarios: one, that defendant kidnapped, raped and then murdered the victim; and the other, that defendant kidnapped and raped the victim, but then stood by while Martinez murdered her. But as we have explained, *ante,* defendant, under the circumstances of the case, was liable for first degree murder on a felony-murder theory even if he passively stood by while Martinez killed the victim because defendant "directly and actively" (CALJIC No. 8.27) participated in the rape. *Gavin* is thus inapposite.

Defendant also cites *People v. Washington* (1965) 62 Cal.2d 777 [44 Cal.Rptr. 442, 402 P.2d 130] in support, arguing the felony-murder instructions delivered to the jury (CALJIC Nos. 8.10, 8.21) did not require the jury to find, as a condition of finding defendant guilty of murder as a nonkilling coparticipant, that the actual killer (Martinez) had aided and abetted defendant's rape of the victim. He claims this omission cannot be deemed harmless.

We find no prejudicial error. In *People v. Washington, supra,* 62 Cal.2d 777, the defendant and a cofelon, James Ball, attempted to rob Carpenter, an employee of a gas station. Carpenter, in self-defense, shot and killed Ball and wounded the defendant. A jury convicted the defendant of felony murder, but this court reversed, concluding that the felony-murder rule could not apply because "the killing [was] not committed . . . in the perpetration or attempt to perpetrate robbery." (*Id.* at p. 781.) This was so, we explained, because the killing was not in furtherance of the robbery. (*Id.* at p. 782.) The view of the felony-murder rule that the killing must somehow advance or facilitate the underlying felony has, however, been superseded by later cases. Thus, in *Cavitt, supra,* 33 Cal.4th 187, we held there need be only a logical nexus between the felony and the killing. Here, overwhelming evidence shows the victim's killing was causally and temporally related to her kidnap and rape.

In sum, because the facts overwhelmingly demonstrate defendant directly and actively participated in Perez's rape and kidnapping, the trial court's failure to instruct the jury with CALJIC No. 8.27 or its equivalent was harmless under any standard.

## CONCLUSION

The judgment of the Court of Appeal is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., Chin, J., and Moreno, J., concurred.

**CORRIGAN, J.,** Concurring.—I concur in the majority's affirming in part and reversing in part the Court of Appeal's judgment. In particular, I agree with the majority's conclusion that substantial evidence supports defendant's conviction for aggravated kidnapping. (Maj. opn., *ante*, at p. 1153.) I think it unnecessary to go further and discuss the asportation standard for simple kidnapping in 1997. (Maj. opn., *ante*, at pp. 1154–1155.)

As the majority notes, defendant asserts "the evidence of asportation was insufficient because it showed the victim was moved less than 90 feet. He maintains that, at the time of his crime, simple kidnapping required a movement of more than 90 feet, and because simple kidnapping was a lesser included offense of aggravated kidnapping, kidnapping for rape must have required a movement of more than 90 feet." (Maj. opn., *ante*, at p. 1154.) The response to this argument is that here, defendant was convicted of aggravated, not simple kidnapping. At the time of his crime, we had recently reaffirmed that for aggravated kidnapping "there is no minimum number of feet a defendant must move a victim." (*People v. Rayford* (1994) 9 Cal.4th 1, 12 [36 Cal.Rptr.2d 317, 884 P.2d 1369]; see *People v. Daniels* (1969) 71 Cal.2d 1119, 1128 [80 Cal.Rptr. 897, 459 P.2d 225] [to define the required movement "in terms of a specific number of inches or feet or miles would be open to a charge of arbitrariness"].)

Appellant's petition for a rehearing was denied November 1, 2006, and the opinion was modified to read as printed above.