Filed 11/12/13  P. v. Bettancourt CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROGER ANTHONY BETTANCOURT,<br><br>    Defendant and Appellant. | H038815<br>(Monterey County<br>Super. Ct. No. SS120451) |

Defendant Roger Anthony Bettancourt[1] was convicted by a jury of forcible rape. On appeal, he argues that the judgment must be reversed because the court refused to instruct the jury on the defense of his reasonable but mistaken belief in the victim's consent to sexual intercourse, in accordance with *People v. Mayberry* (1975) 15 Cal.3d 143 (*Mayberry*).  We find no error and therefore must affirm the judgment.

*Background*

The victim, 18-year-old A., testified at trial.  She was defendant's half-sister; they had the same father.  A. lived in Tacoma, Washington with her boyfriend, M., whom she married a few months before trial.  Defendant lived in Salinas with his mother, S., and her boyfriend, J.  In December 2011, defendant invited A. to visit him in January for his

---

[1] Defendant introduced himself at trial as Anthony Roger Bettancourt. The inconsistency with the charging documents and other trial records is immaterial.

birthday. Defendant and S. bought A. a plane ticket, and she arrived on January 11, 2012, with the intention of staying until January 14, the day after his birthday.

When she first arrived at their home, A. put her duffel bag in defendant's closet because she did not know where she was going to sleep, but later she was offered J.'s daughter's room to sleep in that night. The next day she spent the day with D., another half brother; defendant's friend, Alex; and defendant. Around 10 or 11 p.m., S. took D. home and Alex drove home, and by 11 or 12 p.m., only defendant, S., and A. were there. At trial A. admitted that she had been drinking that night, but she was "still in control of [her] senses" enough to decide whether she was going to have sex with her brother.

After D. and Alex left, A. and defendant stayed in his room, "messing around on Facebook and talking." A. told defendant that she had had an ovarian cyst, and she was concerned that she would not be able to get pregnant. Defendant assured her that she was too young to have kids anyway. Then (or possibly before that) he asked her to "do him a favor." A. said, "It depends on what it is." The favor was "to have sex with him." Defendant explained that he had been in prison for a long time,[2] so it had "been a while since he had [had] sex, and he wasn't sure if his thing worked." A. said no. She remained in his room, thinking this might be "just a strange request and that would be the end of it."

At one point, after midnight, A. was tired and lay down on her side on defendant's bed. Defendant lay down next to her and hugged her. She "didn't think anything of it." But then defendant held her down, with her hands above her head, and pulled her pants and underwear down to her upper thighs. A. struggled to pull them back up and to get away, but defendant was on top of her, holding her face down. A. was yelling and calling

_____

[2] Defendant himself testified that he had been incarcerated for grand theft, and he had been released from custody for two or three months when A.'s visit took place. He later clarified that he was released from San Quentin in November 2011.

him names, but defendant put his hand around her mouth and told her to shut up. The struggle continued; defendant twice put his penis inside her vagina while she continued to try to get away. A. believed that defendant was trying to get it into her anus also; she "could feel it" pressing on both her vagina and her anus.

Eventually A. was able to stand up. Defendant blocked the door. She hit him to get him out of her way, and he pushed and hit her in the face. A. started yelling again, calling him names; and S. began knocking on the door. When the door opened, A. ran out of the room. S. asked her what had happened; while crying, A. told her she wanted to go home and that her brother had had sex with her. S. asked A. if she wanted to call the police, but A. said no, she just wanted to go home. She asked S. to get her belongings from defendant's room; then S. drove her to the airport, stopping to pick up S.'s mother. On the way, S. called the airline to change A.'s flight.

A. had called M. from S.'s house, and he picked her up from the airport in Seattle/Tacoma that morning. She was feeling sick then and did not want to talk about what had happened, but the next day she told him that her brother had raped her.[3] M. was angry; he took A. to the police department, and after an interview there, she was taken to the hospital for an examination. A. learned then that she was seven weeks pregnant.

Defendant presented a very different story to the jury. He stated that when A. arrived at his house, his mother showed A. around and indicated where she could sleep. Defendant and A. did not talk much that night, but the next day, January 12, his friend Alex picked them up to go shopping. They later picked up D. and the four of them "hung out" at defendant's house. By the time both Alex and D. had left, it was close to 11 p.m.

---

[3] M. testified that A. had told him on the phone from Salinas that defendant had raped her. He was "mad . . . real mad." He talked to S. on the phone and sent her angry text messages, insisting that she take A. to the airport or he would call the police. A. began crying as they left the Seattle/Tacoma airport, M. said, and she seemed to be in shock.

While D. was there, the three drank beer, and defendant and A. continued drinking after D. and Alex left. He described "messing around" on the computer and talking, as had A.. They alternated positions, with one sitting at the computer and one on the bed. Eventually, though, both were on the bed. Defendant had his arm around her, assuring her that there was a chance she could have a baby but that it was best to wait till she was older. Defendant told A. about a girl he "had feelings for." Defendant asked her if she would do him a favor and have sex with him; when she said no, they continued their conversation. Both were "buzzing" from the beer, but not drunk.

A. finished the cigarette she was smoking and the beer she had been drinking, and stated that she "wanted to do something." She was seated on the bed; he was standing. At this point, according to defendant, it was about an hour after his request for sex and after the conversation about the ovarian cyst. A. then "laid [*sic*] down on her side and kind of had sex. And she said I had guessed right as to what she was thinking of doing." A. did not say no; she did not try to stop him in any way; she helped him remove her clothes; and she encouraged him during intercourse by saying, " 'Oh, yeah,' 'keep going,' and words like that." Defendant pulled out before ejaculating so that he would not get her pregnant, and instead "aim[ed] more towards [her] underwear," to avoid getting semen on his sheets. A. got up after that and used the restroom; she seemed happy, but there was no conversation.

When she came back into the room, she lay down on her side next to defendant. They began "having sex again and that's when she stated [M.'s] name, and from there she flipped out. She told me to stop, I stopped, got back up. The two began arguing about M., and A. started "socking" him. A. said she wanted to go home, and about 10 minutes or so later, his mother knocked on the door and he opened it. When A. left to use S.'s phone, defendant slammed the door and stayed inside until they returned. S. and A. then used defendant's computer to check departing flights while he went somewhere else in

4

the house.  Later, at their request, he removed A.'s belongings from the closet and put them outside the door.  Then he shut his door again and went to sleep.

On cross-examination by the prosecutor, defendant provided more details.  He explained that initially A. was lying on her side, facing away from him, and he lay down right next to her with her back to his front.  Then, he said, he began pulling her pants down and "she finished the rest."  He pulled down his own pants, and then, according to defendant, "I inserted my penis inside her vagina, and she kept leading me on."  When the court asked specifically what she said, defendant answered, "She didn't say nothing at that time, but moments later—" and the court stopped him.  At this point her pants "were almost all completely off, and from there I inserted and she laid [*sic*] on her stomach and we just continued."  "Almost all completely off" turned out to be mid-thigh; but later A. herself kicked her pants completely off.  During most of the penetration A. was on her stomach, making "sexual noises" to encourage him, while defendant lay on top of her with his hands above his head.

While they were having sex the second time, defendant explained, A. said M.'s name, repeatedly, yet casually, in a "normal tone of voice."  But then defendant told her he did not like M. and said derogatory things about him.  He was "pretty angry" because he had learned from A.'s mother that M. had threatened to kill some of his family.  It was then that defendant and A. "started fighting"; she was angry about what he had said about M., and "she started saying that I raped her . . . because I was talking bad about her boyfriend."  During the fight defendant defended himself against A.'s punches.  At one point he grabbed her arm and threw her on the bed. When she tried to "swing some more punches," he "socked her" on the side of her face to make her "relax."

For the next five minutes the two exchanged more angry words, cursing at each other with raised voices until his mother came to the door to ask him to turn down the music.  A. was still angry, and she told S. that she wanted to go home, but she was

5

composed. Defendant had "a little bit" of regret about having had sex with his sister, but only "because of her saying 'M[.]' and the fight."

Defendant was charged by information with one count of forcible rape (Pen. Code, § 261, subd. (a)(2)) and one count of attempted sodomy by use of force (Pen. Code, §§ 664, 286, subd. (c)(2)). The information also contained an allegation that defendant had served a prior prison term for grand theft of a person. (Pen. Code, §§ 487, subd. (c); 667.5, subd. (b).) At trial the court denied a request by the defense to instruct the jury in accordance with *Mayberry*. The jury found defendant guilty of the rape charge but hung on the attempted sodomy count. Defendant requested a court trial on the Penal Code section 667.5 allegation, which the court found to be true. The court sentenced defendant to a nine-year prison term, consisting of eight years for the rape and one year for the prior prison term. This appeal followed.

*Discussion*

Defendant's sole contention on appeal is that the trial court prejudicially erred by declining to give the requested *Mayberry* instruction. In *Mayberry*, the California Supreme Court held that a mistaken belief that the victim consented to sexual intercourse, if reasonable and in good faith, is a defense to rape because it is incompatible with the wrongful intent necessary for the crime.

In *People v. Williams* (1992) 4 Cal.4th 354 our Supreme Court summarized the essential features of the *Mayberry* defense as follows: "The *Mayberry* defense has two components, one subjective, and one objective. The subjective component asks whether the defendant honestly and in good faith, albeit mistakenly, believed that the victim consented to sexual intercourse. In order to satisfy this component, a defendant must adduce evidence of the victim's equivocal conduct on the basis of which he erroneously believed there was consent. [¶] In addition, the defendant must satisfy the objective component, which asks whether the defendant's mistake regarding consent was reasonable under the circumstances. Thus, regardless of how strongly a defendant may

6

subjectively believe a person has consented to sexual intercourse, that belief must be formed under circumstances society will tolerate as reasonable in order for the defendant to have adduced substantial evidence giving rise to a Mayberry instruction." (*People v. Williams, supra*, 4 Cal.4th at pp. 360-361, fn. omitted; see also *People v. Martinez* (2010) 47 Cal.4th 911, 954 [where defendant claimed lack of contact with victim, no evidence existed to permit inference that he reasonably mistook her conduct for consent].)

Defendant contends that the requisite equivocal conduct by A. existed here, thus providing sufficient evidence that he "reasonably mistook her conduct for consent." (*People v. Martinez, supra*, 47 Cal.4th at p. 954.) He argues that he could have reasonably misinterpreted her intent when, after he expressed the wish to have sex with her, A. "stretched out on his bed and let [him] lie down against her, her back to his front, hugging her." He points to his own testimony as demonstrating that A.'s conduct "induced him to believe that she was consenting to sexual conduct." As he now summarizes that testimony, "after he explicitly made known to her that he wished to have sex with her. . . she laid [*sic*] back on his bed, lying half on her side and half on her stomach. She said, 'I feel like doing something,' and was undisputedly not resisting when appellant hugged her and snuggled up against her as they both lay on their sides. Even more, according to appellant, A. indicated that she had consented to having sex with him by telling him that he had read her mind."

Defendant's argument, however, is misleading. First, even by his own account, after his invitation to have sex A. did not immediately lie down on the bed and say she felt like doing something. Defendant himself testified that it was about an *hour* after his request when A. said she wanted to "do something." She was still *sitting* on the bed at that point. Second, our measure of the evidentiary support for a *Mayberry* defense is whether defendant had a reasonable and good faith belief in the victim's consent if *her* testimony is believed.

7

Defendant nonetheless maintains that the jury might have concluded that defendant reasonably believed that A. had changed her mind because she lay down on the bed "in a provocative position" and allowed him to lie down next to her and hug her. Given the multiple inconsistencies in A.'s testimony, he argues, the jury had multiple reasons for discrediting portions of A.'s testimony: For example, two other people in the house had not heard screaming or fighting; neither of them saw or heard her crying; she was "untruthful" about her marital status; and she was inconsistent about whether she had been drinking that night. Defendant speculates that the jury might have believed that A. "tailored her testimony so as to conform to the demands of a controlling, self-admitted jealous and suspicious boyfriend or husband."

Defendant's argument is answered by the Supreme Court's explanation in *Williams*. There, the defendant testified that the victim, Deborah, initiated sexual contact and assisted him in penetrating her. Deborah, by contrast, "testified that the sexual encounter occurred only after Williams blocked her attempt to leave, punched her in the eye, pushed her onto the bed, and ordered her to take her clothes off, warning her that he did not like to hurt people. This testimony, if believed, would preclude any reasonable belief of consent. These wholly divergent accounts create no middle ground from which Williams could argue he reasonably misinterpreted Deborah's conduct." (*People v. Williams, supra*, 4 Cal.4th at p. 362; see also *People v. Dominguez* (2006) 39 Cal.4th 1141, 1149 [defendant's testimony that victim in fact consented, without evidence that he mistakenly believed she consented, provided contrast to prosecution evidence with no middle ground].)

In this case, as in *Williams*, *supra*, 4 Cal.4th at page 362, defendant's and A.'s accounts were "wholly divergent." According to defendant, A. not only did not resist, but encouraged and even assisted him in accomplishing sexual intercourse. By contrast, A.'s description of the events was of unequivocal resistance: During the act she continuously struggled to free herself from him, and she tried to yell but was silenced by defendant's

8

hand over her mouth. There is no middle ground here. If A.'s testimony is believed, there is nothing in her description of the minutes following the "hugging" that would lead a reasonable person in defendant's position to believe she consented to having sexual intercourse with him. Her testimony establishes that she resisted him throughout the act, whereas his conveyed a picture of her welcoming and encouraging his conduct, even to the point that they had sexual intercourse twice.

Thus, A.'s testimony affords no inference of equivocal conduct, nor other substantial evidence supportive of this defense. The trial court properly declined to instruct the jury on the *Mayberry* defense.

*Disposition*

The judgment is affirmed.

9

_____

ELIA, J.

WE CONCUR:

_____

RUSHING, P. J.

_____

PREMO, J.