Filed 7/15/13  P. v. Canchola CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>      v.<br><br>ALFREDO GRANADOS CANCHOLA,<br><br>   Defendant and Appellant. | G046128<br><br>(Super. Ct. No. 09NF2363)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, John Conley, Judge.  Affirmed.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

## INTRODUCTION

A jury found defendant Alfredo Granados Canchola guilty of committing the offenses of kidnapping for the purpose of committing a lewd or lascivious act upon a child under the age of 14, committing a lewd act upon a child under 14 years of age, kidnapping to commit a sex offense, sexual penetration by a foreign object by force, and attempted kidnapping for the purpose of committing a lewd and lascivious act on a child under 14 years of age. The jury also found true several enhancement allegations.

We affirm. For the reasons we will explain, we hold (1) substantial evidence supported Canchola's conviction for kidnapping to commit a sex offense against J.H., (2) Canchola's trial counsel did not provide ineffective assistance of counsel by failing to object to a portion of an investigating police officer's testimony, and (3) the trial court did not err by instructing the jury with a modified version of CALCRIM No. 1191.

## FACTS

### I.

### MARCH 19, 2009 – OFFENSES AGAINST M.E.

On March 19, 2009, 13-year-old M.E. was walking alone to school in Anaheim, when she saw a man, whom she later identified as Canchola, sitting in the driver's seat of a parked car; the passenger side window was down. Canchola asked her if she wanted a ride to school and she responded, "[n]o." He told her he took English at her school and asked her again if she wanted a ride. M.E. told him she "didn't know." Canchola asked her a third time if he could give her a ride, and she said, "okay." He reached over and unlocked the passenger side door, and M.E. got into the car. The car had an automatic seatbelt mechanism that closed on M.E.

Canchola told M.E. that his name was "Alex" and shook her hand. He started driving and made a turn he should not have made if he were driving to M.E.'s

2

school.  M.E. asked if he knew which school she attended because he had taken a wrong turn; Canchola told her he was "just taking a different way."  M.E. became scared because she "knew something was wrong."

While driving, Canchola reached over and touched M.E.'s left leg in the middle of her thigh with his right hand.  He moved his hand slowly up and down.  M.E. became scared and told him to stop touching her leg.  She held the seatbelt with the intention of pulling it over her head, but Canchola grabbed the seatbelt, pulled it tighter, and said something about being secure.  M.E. told him to "stop the car, I want to get out." Canchola said nothing and started to drive a little bit faster.

M.E. pulled the seatbelt over her head, opened the door, and jumped out of the car while it was still moving.  She fell onto the road and rolled, injuring herself. Canchola did not stop the car after M.E. jumped out of it, but sped away.

II.

MAY 19, 2009 – OFFENSES AGAINST J.H.

On May 19, 2009, 16-year-old J.H. was at J.R.'s house in Irvine; she was dating J.R. at the time.  Around 1:00 p.m. to 1:30 p.m., J.H. left J.R.'s house to go to the access continuation school she attended to turn in homework and get more work for the rest of the week.  Before J.H. left J.R.'s house, she had smoked "a lot" of crystal methamphetamine; she testified that she had a "problem" with crystal methamphetamine at that time in her life.

After J.H. dropped off her homework at school and was driving southbound on the 405 Freeway to return to J.R.'s house, she saw "a car like going at the same speed [she] was going."  She testified, "if I would speed up, it would speed up, just like it kept going next to me."  She looked over at the car and saw that the driver, later identified as Canchola, was waving at her to roll down her window.  She had never before seen Canchola.  After J.H. rolled down her window, Canchola asked her for directions to Lake

3

Forest. She motioned with her hand forward to indicate that Canchola should continue driving southbound on the 405 Freeway.

Canchola indicated to J.H. that he could not hear her by cupping his hand in a circular fashion around his ear with his palm open. He then pointed to the Culver Drive exit and motioned to her to pull over. J.H. thought about it for a second. She considered that J.R. lived "off that exit," and she "get[s] lost all the time." She thought, "I'll be a good person," "help someone out," and "give them directions or something." J.H.'s judgment was impaired due to smoking crystal methamphetamine that morning.

J.H. followed Canchola's car as it exited the 405 Freeway, turned right on Culver Drive, turned on Michelson Drive, and then turned right on Parkside. Canchola parked his car on the street near an apartment complex.

J.H. parked her car behind Canchola's car. After she pulled up behind his car on the right-hand side of Parkside, she rolled down her window "like an inch," and lit a cigarette "because [she] got like a gut feeling that it was just like a bad situation"; she thought she "probably should not have like gotten off the freeway." Canchola approached J.H.'s car, said he wanted to smoke, and asked for a cigarette. He also motioned for J.H. to get out of her car.

J.H. got out of her car; she continued to smoke. She was holding "a bunch of stuff" in her hands, including a big key chain with "a million things on it," lighters, and a pack of cigarettes; her phone was in her back pocket.

J.H. stood there for a few moments between Canchola's car and her car on the drivers' sides of the cars and "exchanged names and stuff" in the street before Canchola asked her if she would like to get into his car. She told him, "[n]o," and said something to the effect that she was in trouble with her mother and had to go home.

Canchola grabbed some of the items that were in J.H.'s hands, including her keys, and then grabbed her arm. J.H. "snatched [her] arm back" and said, "no." Canchola grabbed her arm again; he pulled her between their cars, onto the grass, and

4

then to the passenger side of his car. He shoved her into his car, although he did not do so in a "real aggressive" or violent manner. She said, "what the fuck," and he shut the door. She tried to open the passenger side door of his car by pulling on the handle, but it would not open.

Canchola got into the driver's seat and shut the door. He told J.H. he worked on cars in Lake Forest. He started playing with her hair.

J.H. texted J.R., telling him that "some fucking dude has me in his car. Come get me." J.H. testified that she could text without looking and the loose pants she was wearing enabled her to text J.R. without Canchola seeing what she was doing. Canchola's fingers touched her leg and her face. He kissed her, both "closed mouth and open mouthed," and shoved his tongue down her throat. She said, "don't fucking touch me," "get the fuck off of me," and "let me out of the fucking car." J.H. testified she never consented to any of the stroking or kissing. Canchola "shush[ed]" her over and over, and told her, "it's going to be okay." He also told her that she "like[d] this." At some point, J.R. texted back to J.H., "where are you," and she replied, "Michelson and Parkside."

Canchola eventually saw J.H. texting; he asked her to whom she was texting. He took her cell phone and looked through it. J.H. told him she was looking to pick up or score some drugs. He asked what drugs and she told him speed; he said he could get that.

Canchola's body was "over in the passenger side of the car" and J.H. pushed against his chest. Canchola pulled her to the driver's side, by wrapping his arms around her arms; she faced the windshield and her shins were pressed against the steering wheel, which hurt her. J.H. started to "freak out" and became "really scared" because he was becoming "really forceful." Her left arm was stuck; his left arm was over her left arm and his right arm "was like all over [her]." He touched her breasts under her shirt. Canchola's hand moved up and down J.H.'s body, rubbing it.

5

J.H. asked Canchola to stop, and said, "please, don't do this. . . . [P]lease stop." She reached for the door handle with her right arm, but he put his hand over the handle so she could not open it. He was shushing her the whole time. Canchola rubbed J.H.'s leg inside her pants and then he put two of his fingers inside her vagina; he was forceful and hurt her. She was crying and squirming, but he held her down. She tried to get his fingers out of her vagina.

J.R. drove up in a car driven by his friend, D.G. Canchola pushed J.H. over to the passenger seat or to the middle center console when he saw J.R. "charging up" to the car. J.R. told Canchola to roll down the window and let J.H. "out of the fucking car." J.R. got J.H. out of the car and told her to get into her own car. J.R. then told Canchola to "get out of the fucking car," and Canchola said, "no." J.R. pulled Canchola out of the car; he told Canchola to give J.R. the keys he took from J.H. Canchola told J.R., "hey, we're just friends," and J.R. started punching Canchola in the stomach.


III.

AUGUST 15, 2009 – OFFENSES AGAINST S.N.

In August 2009, 10-year-old S.N. lived in an apartment in Anaheim with her family. On August 15, S.N., her father, and her brother were cleaning out their garage when she found her old, dirty backpack. She asked her father if she could go throw it out, and her father said, "yeah, but come back quickly." As she rode her scooter to the dumpster in the apartment complex, she turned around because she heard a car coming. She saw a man in the driver's seat of a car, whom she later identified as Canchola; he asked her, "do you know this person?" S.N. did not understand what he was talking about, so she said, "no, I don't," and kept walking.

Canchola parked the car. He walked up to S.N., pulled out a few bills from his wallet, and asked her if she wanted money. S.N. said, "no, thank you. My parents are over there." S.N. threw the backpack and other garbage into the dumpster. Canchola

6

went back to his car (the car door was open), and asked, "[w]ould you like to come in and talk to me friend to friend?" S.N. said, "no, no thank you. My parents are over there," and she walked away. Canchola sat down and said something to the effect of "come here, sit next to me for a minute." S.N. testified that he "kept on hesitating." S.N. got on her scooter and returned to her father; she told him what had happened. She and her father saw Canchola back up the car and drive away "really fast" from the apartment complex.

BACKGROUND

Canchola was charged in an amended information with (1) kidnapping M.E. for the purpose of committing a lewd or lascivious act upon a child under the age of 14, in violation of Penal Code section 207, subdivision (b) (count 1); (2) committing a lewd or lascivious act upon M.E., a child under 14 years of age, in violation of Penal Code section 288, subdivision (a) (count 2); (3) kidnapping to commit a sex offense against J.H., in violation of Penal Code section 209, subdivision (b)(1) (count 3); (4) sexual penetration by a foreign object by force against J.H., in violation of Penal Code section 289, subdivision (a)(1) (count 4); and (5) attempted kidnapping for the purpose of committing a lewd or lascivious act against S.N., a child under 14 years of age, in violation of Penal Code sections 664, subdivision (a) and 207, subdivision (b) (count 5). (All further statutory references are to the Penal Code unless otherwise specified.)

The amended information contained three enhancement allegations. First, the amended information alleged, pursuant to section 1203.066, subdivision (a)(6), Canchola committed count 2 while kidnapping M.E. Second, it alleged, pursuant to section 667.61, subdivisions (a) and (d)(2), that in the commission of counts 2 and 4, Canchola kidnapped his victims (M.E. and J.H., respectively) and that such movement of the victims substantially increased the risk of harm to them over and above the level of risk necessarily inherent in those offenses. Finally, the amended information alleged,

7

pursuant to section 667.61, subdivisions (a) and (e), that in the commission of counts 2 and 4, Canchola kidnapped the victims in violation of sections 207, 209, and 209.5, and committed an offense specified in section 667.61, subdivision (c) against more than one victim.

The jury found Canchola guilty of all counts and found true the three enhancement allegations. Canchola was sentenced to an indeterminate prison term of 50 years to life, plus a determinate prison term of five years six months. Canchola appealed.

## DISCUSSION

### I.

#### SUBSTANTIAL EVIDENCE SUPPORTED CANCHOLA'S CONVICTION ON COUNT 3 FOR KIDNAPPING J.H. FOR THE PURPOSE OF COMMITTING A SEX OFFENSE.

Canchola argues the trial court erred by denying the motion for judgment of acquittal, pursuant to section 1118.1, he brought at the close of the prosecution's case, which challenged the sufficiency of the evidence supporting count 3—kidnapping for the purpose of committing a sex offense against J.H. He argues insufficient evidence supported the asportation element of that offense. For the reasons we explain, Canchola's argument is without merit.

#### A.

*Standard of Review*

"In ruling on a section 1118.1 motion, the trial court applies the same standard used by the appellate court ""'in reviewing the sufficiency of the evidence to support a conviction, that is, "whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged."'" [Citation.] 'The purpose of a motion under section 1118.1 is to weed out as soon as possible those few instances in which the prosecution fails to make even a prima facie case.' [Citations.] The question 'is simply

8

whether the prosecution has presented sufficient evidence to present the matter to the jury for its determination.' [Citation.] The sufficiency of the evidence is tested at the point the motion is made. [Citations.] The question is one of law, subject to independent review." [Citation.]'" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1079.)

B.

*Governing Legal Principles*

"[S]imple kidnapping" in violation of section 207, subdivision (a) requires proof of "'three elements: (1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance.'" (*People v. Bell* (2009) 179 Cal.App.4th 428, 435.) "This last element, i.e., that the victim be moved a substantial distance, is called the 'asportation' element." (*Ibid.*)

"Aggravated kidnapping," in violation of section 209, subdivision (b)(1), involves a kidnapping "for the purpose of robbery or certain sex offenses." (*People v. Martinez* (1999) 20 Cal.4th 225, 232.)[1] The asportation element of aggravated kidnapping has two prongs: "[A]ggravated kidnapping requires movement of the victim that is not merely incidental to the commission of the underlying crime and that increases the risk of harm to the victim over and above that necessarily present in the underlying crime itself." (*People v. Martinez, supra,* at pp. 232-233.)[2] "The two prongs of aggravated kidnapping are not distinct, but interrelated, because a trier of fact cannot consider the significance of the victim's changed environment without also considering

---

[1] Section 209, subdivision (b)(1) includes "[a]ny person who kidnaps or carries away any individual to commit robbery, rape, . . . or any violation of Section . . . 289." Section 289 proscribes sexual penetration by a foreign object.

[2] Section 209, subdivision (b)(2) provides, "[t]his subdivision shall only apply if the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense."

whether that change resulted in an increase in the risk of harm to the victim." (*People v. Martinez, supra*, at p. 236.)

In *People v. Martinez, supra*, 20 Cal.4th at page 233, the Supreme Court explained: "In determining 'whether the movement is merely incidental to the [underlying] crime . . . the jury considers the "scope and nature" of the movement. [Citation.] This includes the actual distance a victim is moved. However, we have observed that there is no minimum number of feet a defendant must move a victim in order to satisfy the first prong.' [Citations.]" The court further explained that analysis of the second prong of the asportation element of aggravated kidnapping involves "'consideration of such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes. [Citations.] The fact that these dangers do not in fact materialize does not, of course, mean that the risk of harm was not increased. [Citations.]'" (*Ibid.*)

In *People v. Dominguez* (2006) 39 Cal.4th 1141, 1149 (*Dominguez*), the California Supreme Court "once again address[ed] the question of when evidence of forced movement of a victim is sufficient to satisfy the statutory requirement of asportation, a critical element of the crime of aggravated kidnapping." In that case, substantial evidence showed the defendant forced the victim against her will to move from the shoulder of a road, down an embankment, and partially into a walnut orchard that was approximately 25 feet away from the road, for the purpose of committing a rape. (*Id.* at p. 1151.) The defendant argued the forced movement was for a distance no greater than that which was merely incidental to the commission of the rape and did not substantially increase the risk of harm to his victim. (*Ibid.*)

The Supreme Court explained: "Whether a forced movement of a rape victim (or intended rape victim) was merely incidental to the rape, and whether the

10

movement substantially[3] increased the risk of harm to the victim, is difficult to capture in a simple verbal formulation that would apply to all cases.  We discussed the standard in [*People v.* ]*Rayford* [(1994) 9 Cal.4th 1] and explained that the jury must 'consider[] the "*scope and nature*" of the movement,' as well as '*the context of the environment in which the movement occurred*.'  [Citations.]  This standard suggests a multifaceted, qualitative evaluation rather than a simple quantitative assessment.  Moreover, whether the victim's forced movement was merely incidental to the rape is necessarily connected to whether it substantially increased the risk to the victim.  'These two aspects are not mutually exclusive, but interrelated.'  [Citation.]"  (*Dominguez*, *supra*, 39 Cal.4th at pp. 1151-1152.)  The Supreme Court further explained:  "The essence of aggravated kidnapping is the increase in the risk of harm to the victim caused by the forced movement.  [Citation.]  We have articulated various circumstances the jury should consider, such as whether the movement decreases the likelihood of detection, increases the danger inherent in a victim's foreseeable attempts to escape, or enhances the attacker's opportunity to commit additional crimes.  [Citation.]"  (*Id.* at p. 1152.)

　　　　The Supreme Court held that the appellate court, in finding insufficient evidence of asportation in that case, "focused too narrowly on a subsidiary aspect of the analysis, measured distance, rather than considering how all the attendant circumstances related to the ultimate question of increased risk of harm."  (*Dominguez*, *supra*, 39 Cal.4th at p. 1152.)  The court explained that although it is necessary to consider the

---

　　　3　In 1997, the Legislature "modified the asportation standard by eliminating the requirement that the movement of the victim 'substantially' increase the risk of harm to the victim."  (*People v. Vines* (2011) 51 Cal.4th 830, 869, fn. 20.)  The crimes at issue in *People v. Vines*, *supra*, 51 Cal.4th at page 840; *People v. Martinez*, *supra*, 20 Cal.4th at page 229; and *People v. Dominguez*, *supra*, 39 Cal.4th at pages 1145, 1150, footnote 5, however, occurred before the 1997 amendment to section 209, subdivision (b)(2) took effect.  (*People v. Robertson* (2012) 208 Cal.App.4th 965, 980-981.)  Thus, in those cases, the Supreme Court analyzed whether the movement at issue *substantially* increased the risk of harm.  (*Ibid.*)

11

actual distance the victim was forced to move, "we have repeatedly stated no minimum distance is required to satisfy the asportation requirement [citation], so long as the movement is substantial [citation]. [¶] Measured distance . . . is a relevant factor, but one that must be considered in context, including the nature of the crime and its environment. In some cases a shorter distance may suffice in the presence of other factors, while in others a longer distance, in the absence of other circumstances, may be found insufficient." (*Ibid.*)

The Supreme Court cited several examples: "For example, moving robbery victims between six and 30 feet within their home or apartment [citation] or 15 feet from the teller area of a bank to its vault [citation] may be viewed as merely incidental to the commission of the robbery and thus insufficient to satisfy the asportation requirement of aggravated kidnapping. Yet, dragging a store clerk nine feet from the front counter of a store to a small back room for the purpose of raping her [citation] or forcibly moving a robbery victim 40 feet within a parking lot into a car [citation] might, under the circumstances, substantially increase the risk of harm to the victim and thus satisfy the asportation requirement." (*Dominguez*, *supra*, 39 Cal.4th at p. 1152; see *People v. Rayford* (1994) 9 Cal.4th 1, 23 [substantial evidence supported asportation element in aggravated kidnapping case in which the victim was forcibly moved 105 feet at night from the parking lot of a closed store to the other side of a wall, "limit[ing] detection" of the victim from the street]; *People v. Aguilar* (2004) 120 Cal.App.4th 1044, 1046 [as the defendant forcibly moved his victim 133 feet at night into an unlit area where he "was less likely to be detected," such movement is not merely incidental to the crime of kidnapping to commit rape but also increases the risk of harm to the victim].)

The Supreme Court stated that "a forced movement need not be into an 'enclosure' to effect a substantial increase in the risk of harm. Moreover, a reasonable jury could have concluded that the place to which the victim was moved was in fact one obscured from public view." (*Dominguez*, *supra*, 39 Cal.4th at p. 1154; see *People v.*

12

*Aguilar*, *supra*, 120 Cal.App.4th at p. 1049 ["Courts have held that moving a victim to a more isolated open area which is less visible to public view is sufficient"].)

Applying the governing legal principles summarized *ante*, the California Supreme Court held substantial evidence supported the defendant's conviction for aggravated kidnapping in light of the evidence the victim was moved to a "more secluded" location "where it was unlikely any passing driver would see her," which "substantially decreas[ed] the possibility of detection, escape or rescue." (*Dominguez*, *supra*, 39 Cal.4th at p. 1153.)

C.

*Substantial Evidence Supported the Asportation Element of Count 3.*

Here, J.H. testified that after she refused Canchola's request that she get into his car, he grabbed, inter alia, her car keys and then her arm. She was able to pull her arm back, but Canchola grabbed it again and dragged her from the street where she and Canchola stood between their cars, and onto the grass on the side of the street; he opened the passenger side door of his car and shoved her in. He shut the door behind her. She tried to open the door, but it was locked.

A reasonable trier of fact could have inferred Canchola's movement of J.H. from the street to inside his parked (and locked) car "served several purposes" (*People v. Robertson* (2012) 208 Cal.App.4th 965, 985), and was not merely incidental to the commission of the sexual penetration offense he committed inside the car. Substantial evidence supported the inference Canchola's forced movement of J.H. was done to decrease the likelihood of detection as he limited the visibility of his sexual offenses by moving her from the street to inside the parked car. Also, were J.H. to scream for help, it would have been more difficult to hear her from inside the car. He could also drive her away to a more secluded area. Substantial evidence supported the inference that by so secluding J.H., Canchola enhanced his opportunity to commit additional crimes against her.

13

Substantial evidence showed J.H. was more easily restrained and less likely to escape after she was locked inside the car than when she was standing on the street. While on the street, she was able to free her arm after Canchola first grabbed it. Canchola was able to prevent her from escaping after she was locked inside his car, as evidenced by his successful efforts to prevent her from opening the car door in an effort to escape from him. By moving J.H. into his car, Canchola undoubtedly increased the risk of harm to J.H. over and above that necessarily present in committing the offense of sexual penetration by a foreign object, for many of the reasons discussed *ante*.

D.

*J.H.'s Testimony Was Not Inherently Incredible.*

In his opening brief, Canchola argues, "[a]s an alternate basis for reversing count 3, . . . [J.H.]'s testimony falls short of substantial credible evidence consistent with due process." Canchola argues the only evidence supporting the asportation element of count 3 was J.H.'s testimony, but J.H. was not credible because she inconsistently stated that Canchola forced her into his car, but did so nicely.

J.H. described how Canchola forced her into his car, but he was not particularly violent in doing so. During cross-examination, she testified as follows:

"Q  You were five-nine in 2009, okay. So he opened the door. Did he shove[] you into the passenger side or did he escort you in? How did he put you in the passenger side?

"A  I was like kind of like a mix of both. Like it wasn't like a shove like he was going to kill me shove, but it wasn't like a nice escort into the car. I don't know if that makes sense.

"Q  Why did you—remember you spoke earlier, you said you spoke with Officer Hawkins in Hoag Hospital?

"A  Yes.

14

"Q Do you remember why you told him that the driver kind of got you in there nicely? Why did you use the adjective 'nicely'?

"A Because I think I said 'nicely forced.'

"Q Right. I don't understand how can it be force, and nice?

"A That's what I kind of just said. Like he didn't like—I don't know. I don't know how to explain it. Like didn't like shove me in there to the point where I like cracked my head on a window or anything. But he didn't like make, like put me in there where it was super comfortable.

"Q No. I understand you were not comfortable on the passenger seat. My question is, the manner in which he asked you or pushed you or shoved you into the passenger side of the red car, was that nice, or was it by force?

"[The prosecutor]: Objection, asked and answered.

"The Court: Overruled. [¶] You may answer. Try to explain.

"The witness: What's the question?

"By [Canchola's counsel]: [¶] Q The way you got into the car, was it nice or was it by force? Was it 51 percent nice, 49 percent force? 70 percent force, 30 percent nice? How can you—can you describe how was it that it was forceful and nice?

"A I don't know how you want me to explain it again. I just explained it twice. It was forced. He like forced me in the car, but like he, like didn't completely slam me in there."

J.H. was consistent in testifying that Canchola forced her into his car against her will. J.H.'s testimony regarding how violent the movement was does not undermine her credibility on this point.

Canchola also argues J.H.'s testimony was not credible because she could have manually unlocked the car door and her exchange of text messages with J.R. was implausible. Canchola also argues there was no evidence regarding how J.H. was suddenly able to get out of the car after J.R. arrived. Canchola also argues that "[J.H.]

15

had problems"; she was addicted to methamphetamine and admitted she was high at the time she met Canchola and had been uncooperative with authorities.

As appropriately pointed out in Canchola's opening brief, Evidence Code section 411 provides that the testimony of a single witness is sufficient to uphold a judgment even if it is inconsistent, false in portions, or contradicted by other evidence. (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 366.)  Furthermore, "''"[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citations.]'"  [Citation.]'"  (*People v. Avila* (2006) 38 Cal.4th 491, 590.)

Here, J.H.'s testimony describing Canchola grabbing her and forcing her into his car was not inherently incredible.  Canchola's substantial evidence challenge is without merit.


## II.

### CANCHOLA'S TRIAL COUNSEL DID NOT RENDER INEFFECTIVE ASSISTANCE BY FAILING TO OBJECT TO DETECTIVE VICTORIA HURTADO'S STATEMENTS REGARDING J.R.'S FATHER.

Canchola contends his trial counsel was ineffective for failing to object to a portion of Irvine Police Department Detective Victoria Hurtado's testimony; Hurtado had been assigned to investigate the events of May 19, 2009, involving J.H.  During cross-examination, Canchola's trial counsel asked Hurtado about her interview with J.R. and what he said he saw after arriving on the scene on May 19.  Hurtado testified that J.R. said he was given a ride by a friend (D.G.), saw J.H. standing outside of Canchola's car, and got out of the car; Canchola was seated in the driver's seat "with a leg out the door, but had a[]hold of her arm."

16

During redirect examination, Hurtado provided the following testimony without objection from Canchola's trial counsel:

"Q Now, you testified before that [J.R.] told you that when he arrived, that [J.H.] was outside of the car, and Mr. Canchola was holding her arm?

"A Yes.

"Q Did he describe that as he was restraining her?

"A I specifically asked him if it appeared that he was restraining her, and he said yes.

"Q Now, when [J.R.] told you that he saw [J.H.] outside of the car, was there anything that led you to believe that that was not accurate?

"A Yes, there was.

"Q And what was that?

"A Well, the fact that [J.H.] had told me that she was in the car. And then a conversation that I had with [J.R.]'s father . . . ."

Hurtado further testified, without any objection from Canchola's trial counsel, that J.R.'s father told her "that his son was concerned because he had gotten a call from a friend of his, and that some guy was trying to drag her in his car. And that [J.R.] had shown up there with a friend and hit the guy a couple of times. And he actually found her in the car. So, he hit him several times. And because he hit this guy, he was afraid he was going to get in trouble with the police."

To prevail on a claim of ineffective assistance of counsel, Canchola must prove both (1) his attorney's representation was deficient in that it fell below an objective standard of reasonableness under prevailing professional standards, and (2) his attorney's deficient representation subjected him to prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Cain* (1995) 10 Cal.4th 1, 28.)

Even assuming Canchola's trial counsel's representation was deficient because he failed to object to Hurtado's testimony regarding J.R.'s father's statements to

17

her on the ground it constituted inadmissible hearsay, Canchola did not suffer any prejudice. The offense of kidnapping in order to commit a sex offense had already been completed by the time J.R. arrived on the scene. Therefore, whether J.H. was inside or outside of Canchola's car when J.R. arrived is not relevant to the determination of Canchola's guilt of that offense.

Furthermore, Canchola was not prejudiced by his trial counsel's omissions because Hurtado's testimony regarding J.R.'s father's statements was duplicative of J.H.'s testimony that she was inside Canchola's car when J.R. arrived. It was also duplicative of the testimony of J.R.'s friend, D.G., who testified that when they arrived at the scene, J.H. was in the passenger seat of Canchola's car.

### III.

### CALCRIM No. 1191

In his opening brief, Canchola argues the trial court violated his constitutional right to due process and statutory rights by giving the jury a modified version of CALCRIM No. 1191, which instructed, "they could consider *charged* offenses as evidence of the defendant's propensity to commit other charged offenses." (Italics added, capitalization & boldface omitted.) CALCRIM No. 1191, which is based on Evidence Code section 1108,[4] in its unmodified form, instructs that jurors may consider

---

[4] Evidence Code section 1108, subdivision (a) provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." (See *People v. Falsetta* (1999) 21 Cal.4th 903, 911.) Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

18

uncharged sex offenses as evidence of a defendant's propensity to commit charged sex offenses.

The modified version of CALCRIM No. 1191, given to the jury in this case, stated: "The People presented evidence that the defendant committed the charged offenses. These offenses are defined for you in these instructions. The People must prove each of the charged offenses beyond a reasonable doubt. [¶] If you decide that the defendant committed any of the charged offenses beyond a reasonable doubt, you may, but are not required to, conclude from that evidence that defendant was disposed or inclined to and did have the specific intent for other charged crimes. [¶] If you conclude that the defendant committed any of the charged offenses beyond a reasonable doubt, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of any of the other charged offenses. The People must still prove each charged offense beyond a reasonable doubt. [¶] If you decide that the defendant committed any of the charged offenses beyond a reasonable doubt, you may also consider that evidence for the purpose of determining defendant's credibility and for the purpose of determining whether the defendant acted with the specific intent required for any of the other charged offenses. The specific intent required is explained in the instructions for these crimes. [¶] In evaluating this evidence for this purpose, consider the similarity or lack of similarity between the offenses. [¶] Do not consider this evidence for any other purpose."

Since Canchola filed his opening brief, the California Supreme Court decided *People v. Villatoro* (2012) 54 Cal.4th 1152, 1156, 1167-1169 (*Villatoro*), in which the court held the trial court did not err by instructing the jury it could consider one or more charged offenses that the jury had determined the defendant committed beyond a reasonable doubt as evidence of the defendant's disposition to commit other similar charged offenses. The Supreme Court explained: "Character evidence, sometimes described as evidence of a propensity or disposition to engage in a type of conduct, is

19

generally inadmissible to prove a person's conduct on a specified occasion. [Citations.] . . . The Legislature has . . . created specific exceptions to the rule against admitting character evidence in cases involving *sexual offenses* [citation], and domestic violence, elder or dependent abuse, or child abuse [citation]. [Citation.]" (*Id.* at p. 1159, italics added.)

In *People v. Falsetta*, *supra*, 21 Cal.4th at page 915, the Supreme Court stated: "As the legislative history indicates, the Legislature's principal justification for adopting [Evidence Code] section 1108 was a practical one: By their very nature, sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence. The ensuing trial often presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations. Section 1108 provides the trier of fact in a sex offense case the opportunity to learn of the defendant's possible disposition to commit sex crimes."

In *Villatoro*, *supra*, 54 Cal.4th at page 1164, the Supreme Court held: "[W]e conclude nothing in the language of [Evidence Code] section 1108 restricts its application to uncharged offenses. Indeed, the clear purpose of section 1108 is to permit the jury's consideration of evidence of a defendant's propensity to commit sexual offenses. 'The propensity to commit sexual offenses is not a common attribute among the general public. Therefore, evidence that a particular defendant has such a propensity is especially probative and should be considered by the trier of fact when determining the credibility of a victim's testimony.' [Citations.] '[C]ase law clearly shows that evidence that [a defendant] committed other sex offenses is at least circumstantially *relevant* to the issue of his disposition or propensity to commit these offenses.' [Citations.] In light of this clear purpose, we perceive no reason why the Legislature would exclude charged sexual offenses from section 1108's purview, and no indication that it did so in either the text of section 1108 or its legislative history. Whether an offense is charged or uncharged in the current prosecution does not affect in any way its relevance as propensity evidence.

20

Indeed, section 1108's legislative history explains that "'admission *and consideration* of evidence of other sexual offenses to show character or disposition would be no longer treated as intrinsically prejudicial or impermissible.'" [Citations.]"

In his reply brief, Canchola states, "[he] acknowledges that this Court must follow *Villatoro* (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450) to the extent its reasoning supports that aspect of the instruction given in this case regarding the *charged* offenses. However, to preserve the issue for further review, [Canchola] respectfully maintains below that the California Supreme Court decision did not comport with federal constitutional due process requirements" in reaching its decision in *Villatoro*. Canchola is correct that we are bound to follow California Supreme Court precedent pursuant to *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455, in concluding the trial court did not err by instructing the jurors they may consider proven similar charged sex offenses as evidence of Canchola's propensity to commit other charged offenses.

The modified CALCRIM No. 1191 instruction given in this case also instructed the jurors that they could consider evidence of proven similar charged offenses "for the purpose of determining defendant's credibility and for the purpose of determining whether the defendant acted with the specific intent required for any of the other charged offenses." This portion of the instruction is also supported by *Villatoro*, *supra*, 54 Cal.4th at page 1159, which stated that Evidence Code section 1101, subdivision (a)'s "ban against admitting character evidence to prove conduct, however, does not prohibit admission of specific acts of misconduct to establish a material fact like *intent*, common design or plan, or identity [citation], and does not affect the admissibility of evidence regarding the *credibility* of a witness [citation]." (Italics added.)

In light of the similarity of the charged offenses and the short timeframe in which all of the charged offenses were committed, we find no instructional error.

IV.

THERE WAS NO CUMULATIVE ERROR.

Canchola argues the errors during trial, considered cumulatively, support reversal.  We have not identified any such errors by the trial court.  As discussed *ante*, even assuming that Canchola's trial counsel improperly failed to object to Hurtado's testimony, that omission was not prejudicial.  Canchola's claim of cumulative prejudice thus necessarily fails.  (*People v. Brents* (2012) 53 Cal.4th 599, 619.)

DISPOSITION

The judgment is affirmed.

FYBEL, ACTING P. J.

WE CONCUR:

IKOLA, J.

THOMPSON, J.