Filed 10/29/13  P. v. Caratachea CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JACK JOSE CARATACHEA,<br><br>Defendant and Appellant. | A134858<br><br>(Sonoma County<br>Super. Ct. No. SCR603019) |

Pursuant to the One Strike law, Penal Code section 667.61,[1] defendant Jack Jose Caratachea was sentenced to 25 years to life because the jury found that, in committing the unlawful sexual penetration of Jane Doe, defendant kidnapped Doe and the movement of her substantially increased the risk of harm to her over and above that level of risk necessarily inherent in that sexual offense.  Defendant contends there was insufficient evidence to support the jury's finding.  He asks that the judgment be reversed, the One Strike law allegations be stricken, and the matter be remanded for resentencing.  We conclude there was substantial evidence to support the jury's finding and affirm the judgment in its entirety.

**BACKGROUND**

By information filed in August 2011, the Sonoma County District Attorney charged defendant with committing an act of sexual penetration against the will of Doe by means of force, violence, duress, menace, and fear of immediate and unlawful bodily injury on Doe and another person (§ 289, subd. (a)(1)).  This count was accompanied by

---

[1] All statutory references herein are to the Penal Code unless otherwise indicated.

1

the alternative allegations that defendant had kidnapped Doe and the movement of her had substantially increased the risk of harm to her over and above that level of risk necessarily inherent in the unlawful sexual penetration (§ 667.61, subd. (d)(2)), or had simply kidnapped Jane Doe (§ 667.61, subd. (e)(1)). It was also alleged that defendant had inflicted great bodily injury on Jane Doe.

Defendant was also charged with one count each of felony child abuse (§ 273, subd. (a)) and aggravated assault by force likely to produce great bodily injury (§ 245, subd. (a)(1)). The aggravated assault charge was accompanied by a great bodily injury allegation as well.

It was further alleged that, as a result of the accompanying great bodily injury allegations, the unlawful sexual penetration and aggravated assault charges were serious felonies within the meaning of section 1192.7, subdivision (c)(8), and the aggravated assault charge was a violent felony within the meaning of section 667.5, subdivision (c)(8).

Defendant pled not guilty to all charges. A jury trial commenced in November 2011. We focus on the evidence relevant to the issue raised by defendant in his appeal: whether there was substantial evidence to support the jury's finding that defendant kidnapped Doe and the movement of her substantially increased the risk of harm to her over and above the level of risk necessarily inherent in the underlying offense.

### *Testimony of Jane Doe*

Jane Doe testified that on June 3, 2011, she was eight and a half months pregnant. Her belly was "pretty big" and it was difficult for her to move around. About 6:15 p.m. that day, when it was still daylight, she was out for a walk on Hearn Avenue in Santa Rosa, California, pushing a cart that contained her two-year-old son. She was wearing thin maternity stretch pants.

Doe said she was walking on the sidewalk, just past some railroad tracks in an area that was lined by a fence, heading to a store to buy ice cream. She felt someone walking behind her and yielded, moving to her right. A man, whose face Doe saw during the attack and who she identified at trial as defendant, grabbed her from behind and wrapped

2

his arms around her waist, below her pregnant belly. He lifted her up off the ground, carried her backwards a distance of two or three meters, and threw her down "aggressively" to the right, "against some bushes" in a dark area located on a downward slope of ground where there were rocks and grass, just to the right of the fencing that lined the sidewalk. Asked, "What did you see?" when he lifted her off her feet, Doe said, "That he wanted to take me towards the bushes." She estimated they went backwards for about five seconds, and said she did not remember exactly how many steps back defendant took, although she estimated it was about two steps or half steps at one point in her testimony.

Doe said she landed on her knees about a meter or a meter and a half from sidewalk and put her hands in front of her to protect her belly. She was approximately three meters from her son, whose face she could see from her vantage point and who was looking at her.

According to Doe, defendant hit her on her head and then said in Spanish, using vulgar, violent words, "I just want you to suck it" or "I want you to give me a blow job." He repeated it again during his attack in an anxious voice. Doe screamed and asked for help, told him she was pregnant, and asked him not to hurt her or her baby. Defendant continued to hit her on the head while putting force on her arms and, when she turned her head to look for her son, defendant struck her face. He told her to shut up, grabbed her hair, and hit her on the back and top of her head. He hit her 10 to 15 times, and hit her one time each on her nose, mouth, and eye. At one point, Doe told defendant she would do whatever he wanted if he calmed down, hoping someone would come and take him away from her, and she repeatedly told him not to hurt her. Defendant told her to shut up and struck her harder whenever she screamed. Doe felt pain and became dizzy as he hit her.

According to Doe, defendant grabbed her shoulder and tried to turn her around; her shoe was caught in the fencing momentarily, resulting in her leg being scratched. Defendant flipped Doe over onto her back. She put her knees up, covered her stomach, and kicked at him. He "jammed his fingers" into her thin pants, penetrating her vagina

3

and causing her pain. She tried to push him away with her knees, kicked at him, held her stomach, and covered her face to protect herself. He pulled on Doe's pants, but they were too tight to remove, and tried to lie on top of her, but she prevented him from doing so with her knees.

Doe said some people intervened after about 5 to 10 minutes, at which point defendant stopped pulling on her pants, got up, and ran away. The people helped Doe to her feet. An ambulance arrived a short time later and Doe was taken to the hospital.

As a result of defendant's assault, Doe suffered various injuries, including pain in her head and waist, injuries to her shoulder, leg, knee, and thumb, a bloody lip, a bruised nose, and an injured eye, and pain around her pubic bone. After the attack, she had contractions, had several raised bumps on her head, suffered pain in her head and headaches for about a week, and suffered pain in her hips for about three weeks until her baby was born. Also, her young son was scared to go out and did not want to sit in a cart or stroller.

### *Testimony of Norma Garcia*

Norma Garcia testified that she was driving along Hearn Avenue at the time of the incident when she saw a baby whose mother she knew sitting in a stroller on the sidewalk. A woman was standing next to the stroller. Garcia stopped her car right before the railroad tracks, rolled down her window, and asked the woman where the boy's mother was located. The woman answered that "he's hitting her, and she pointed at this little bushy area that was close by." Garcia looked there and "saw two persons struggling." All Garcia could see was defendant's black clothing on top, but she could hear Doe screaming desperately for help in Spanish. Asked to clarify, Garcia said she was in the far lane of Hearn Avenue and could see "some type of struggling going on," and could see the bodies moving.

Garcia drove past the railroad tracks and made a U-turn, at which point the man stopped fighting. Garcia saw his face clearly, and identified him at trial as the defendant. Garcia left her car and went over to Doe, who, "[a]s she was getting up and she was coming outside from where she was from the bush area, she was holding her abdomen,

4

she was bleeding from her nose, she was bleeding from her mouth and she was really tearful and falling apart." The little boy was sitting a few feet away. There were other people helping as well.

### *Testimony of Herbert Francis Ayers, Jr.*

Herbert Francis Ayers, Jr. testified that he, his wife, and three children were driving down Hearn Avenue at the time of the incident and, when they "hit" the railroad tracks, he saw "a couple going into some bushes" and a baby in a stroller on an overpass, sitting alone. The couple was "falling into the bushes." His wife pulled the car over and Herbert[2] got out and ran back about 30 feet to where the incident was happening, screaming. A man got up and ran away. His wife "helped [Doe] out of the bushes and I kind of stayed there with them just to make sure everything was okay, and she came up out of the bushes, her face was just totally bloody."

Herbert said when he ran back to the incident, he did not know what was going on, thought something bad was happening, and was more concerned about the baby in the stroller. He did not see what was going on between the two people in the bushes because, he said, from "where we were coming down Hearn, they were in the bushes, so really couldn't tell what was happening." His wife and daughter helped out the woman, and he saw, "when they brought her up to the sidewalk," that she "was very bloody face wise" and was crying "big time." The incident occurred very quickly. It was about 10 seconds from the time he got out of the car to when he reached the area of the incident.

### *Testimony of Kimberlee Ayers*

Kimberlee Ayers testified that she was driving along Hearn Avenue at the time of the incident and, as she crossed over railroad tracks, saw "a gentleman in the bushes and a girl that was being pulled backwards, and then there was a child in a stroller sitting up on the little bridge . . . ." She first saw the man and girl on the sidewalk and, by the time she drove by, they had gone into some bushes. The girl "definitely" did not intend to go

---

[2] We use first names in this discussion for clarity's sake, and mean no disrespect by doing so.

into the bushes, but was being pulled from the street backwards by the man. After they went into the bushes, Kimberlee could not see "anything that was happening."

Kimberlee got out of her car and ran to the baby. She could hear Doe screaming. The man popped up out of the bushes as Kimberlee got closer. After he ran away, she "assisted Jane Doe in getting up out of the bushes[.]" Doe was in an area that was "a bit concealed. And it drops down a little bit. So there's a little bit of an incline. Because when I pulled her up, I had to pull her up because she was kind of down." Doe "was all bloody, her face was all bloody, her lip was bleeding, her nose was bleeding out of both sides." The entire incident occurred "very fast," in a matter of seconds.

### Testimony of Denise Ferguson

Denise Ferguson testified that she was driving eastbound on Hearn Avenue at the time of the incident when she saw a "big commotion" on her left. She saw "a lady standing outside her car yelling for someone to help them." Ferguson slowed down and observed "a gentleman pop up and start running down Hearn eastbound, and then a lady came up and was holding her stomach bleeding." The man came up from "a little embankment type thing" near a little crossway or bridge by the railroad, and the injured woman came up from the same area. She saw the man's face and later identified him to police.

### Testimony of Elmer Velasco

Elmer Velasco testified that he was driving westbound on Hearn Avenue at the time of the incident when he saw in the distance "a blur of two bodies that kind of fell over by the train tracks, by some grass." As he got closer, he saw a man was "punching down on someone else" with both hands, so he pulled up to the right side of the man and yelled through his car window for the man to stop. He did not see who was underneath the man, who was "just whaling down punches" in an area of tall grass; Velasco thought it was "an unfair fight at the very least." The man got up and Velasco saw "a woman that stood up and her face was bloody and she yelled out in Spanish. She said my baby." The baby was few feet in front of Velasco. Another car pulled in front of Velasco and people got out and came over as the man ran away. Velasco called 911 and followed the man,

6

then saw someone apprehend him. At trial, Velasco identified defendant as the attacker. He thought about three minutes passed from the time he first saw something until he stopped to see what was happening.

### *Other Relevant Testimony*

Tommy McNeil, a deputy and canine handler with the Sonoma County Sheriff's Department, testified that he went to the scene of the incident soon after it occurred. According to McNeil, Hearn Avenue was "heavily traveled" by cars. Witnesses told him the assault occurred "right off the concrete walkway" by where a fence followed a portion of Hearn Avenue and "button hook[ed]" northward. He was told by a witness that the incident occurred "down in the brush area," where the ground dropped off about two feet from the walkway.

Based on the information he received, McNeil returned to the scene and took photographs. He took measurements based on his own observations and the information he received from witnesses. He testified that the assault started about 20 feet from where the two went off the roadway about six feet, into "a vegetation area" depicted in photographs he had taken. This vegetation was trampled and smashed down, in an area about five feet by two feet.

John Buergler, a detective with the Sonoma County Sheriff's Office, testified that he met another detective at the scene of the assault on the afternoon of June 13, 2011 and took photographs of the scene. He was told by the detective that this was the area of the attack. Buergler observed that "there's a cyclone fence where this area is and there's like a washout where dirt and whatever has eroded down. So it kind of made almost like a small pit area where it washed underneath the cyclone fence. And there was some large rocks that were still embedded into the dirt and kind of in the slope area." He did not measure the distance of the washout area from the sidewalk, but his "rough guess" was that it was about 12 feet.

### *Defendant's Testimony*

Defendant testified that on the day of the incident, he did some cleaning up and then collected and recycled cans. At home, he drank two 40-ounce bottles, a 32-ounce

7

bottle, and two to three cans of beer. His mother detected his drinking and yelled at him. She was angry that he was drinking, in part because she was concerned it would cause him to lose his new job, just as it had caused him to lose a previous one. After they argued for about an hour, he became angry, frustrated, and "pretty stressed." He left the house and began walking to the store to buy more beer, listening to his iPod via headphones.

After walking for about 5 to 10 minutes, defendant said, he saw a woman walking in front of him who he thought was a prostitute because she had dark skin. He had seen "a bunch of people dark skinned walking down Santa Rosa Avenue" and police pull over and talk to women "[t]hrough Santa Rosa Avenue, through Hearn Avenue, through North Dutton." He did not see anyone with the woman or anything unusual about her. He grabbed her by the waist and shoved her, and the two fell into a "little slope." He started to hit the woman "pretty hard," and "kept hitting her and hitting her." The woman punched him two or three times, and he realized what he was doing. He ran away, but was soon stopped by some people.

Asked why he attacked the woman, defendant said his mind was not clear, he was "just tripping at the time," drunk, and "just angry at everything" around him. He was "just stressed out" and thought she "was a hooker just trying to make money off of me or something." The woman had turned her head in a way that gave him the "illusion" she was talking to him. He could not tell if she was because he was wearing his headphones.

Defendant further testified that he did not try to take off the woman's or his own clothes, did not try to force her to touch any part of his body other than his fists, and did not recall using his fingers to touch her vaginal area. He denied to police that he had touched her vaginal area and told them it was a mistake if he did. He told the woman once in Spanish to "go suck a dick," but meant this as the equivalent of "fuck off." He did not try to pick up the woman and was not trying to take her anywhere. He did not know her, felt no animosity towards her, and was not sexually excited by the incident. He did not notice the woman's child or that the woman was pregnant until he stopped hitting her. His attack went on for two or three minutes.

8

### *Testimony of Defendant's Siblings*

Two of defendant's siblings, Jesus Caratachea and America Caratachea, also testified. They indicated that defendant had drank heavily that day, quarreled at home with his mother about his drinking, and left the house drunk and upset.

### *Verdict, Sentence, and Appeal*

The jury found defendant guilty of unlawful sexual penetration in violation of section 289, subdivision (a)(1). It also found true the accompanying allegation, made pursuant to section 667.61, subdivision (d)(2), that he kidnapped Jane Doe and the movement of Doe substantially increased the risk of harm to her over and above that level of risk necessarily inherent in the unlawful sexual penetration. The jury also found true the simple kidnapping allegation made pursuant to 667.61, subdivision (e)(1). The jury did not reach a decision regarding the accompanying great bodily injury allegations.

The jury found defendant not guilty of felony child abuse or attempted child abuse, but guilty of the lesser misdemeanor offense of cruelty to a child in violation of section 273a, subdivision (b). It also found defendant guilty of aggravated assault, but did not reach a decision regarding the accompanying great bodily injury allegation.

The court sentenced defendant to 25 years to life pursuant to section 667.61, subdivision (a), based on defendant's unlawful sexual penetration conviction and the jury's finding that the allegation made pursuant to section 667.61, subdivision (d)(2) was true. The court did not sentence defendant to any additional time for the misdemeanor conviction and stayed a four-year sentence for the assault conviction. Defendant filed a timely notice of appeal.

### DISCUSSION

Defendant argues the evidence was insufficient to support the jury's finding that the aggravated kidnapping allegation made pursuant to section 667.61, subdivision (d)(2) was true. As a result of this finding, the trial court was required to set defendant's sentence at 25 years to life. (§ 667.61, subds. (a), (d)(2).) Defendant also argues the evidence was insufficient to support the jury's finding that the simple kidnapping allegation made pursuant to section 667.61, subdivision (e)(1) was true. He contends the

9

court should have only been authorized to set his sentence at a maximum of eight years pursuant to section 289, subdivision (a)(1). Based on our substantial evidence standard of review, which includes that we construe the evidence in the light most favorable to the judgment, we conclude the jury's aggravated kidnapping finding was supported by sufficient evidence.

## I. *Relevant Legal Standards*

Section 667.61, the One Strike law, "was added to the Penal Code in 1994. [Citations.] Like the Three Strikes law, the One Strike law is an alternative sentencing scheme, but it applies only to certain felony sex offenses. [Citation.] It mandates an indeterminate sentence of 15 to 25 years to life in prison when the jury has convicted the defendant of a specified felony sex crime [citation] and has also found certain factual allegations to be true." (*People v. Anderson* (2009) 47 Cal.4th 92, 102.) Its purpose is " 'to ensure serious and dangerous sex offenders would receive lengthy prison sentences upon their first conviction,' 'where the nature or method of the sex offense "place[d] the victim in a position of elevated vulnerability." [Citation.]' " (*People v. Alvarado* (2001) 87 Cal.App.4th 178, 186, italics omitted.)

Section 667.61, subdivision (a) requires imposition of a sentence of 25 years to life when a defendant is convicted of committing enumerated sexual offenses in section 667.61, subdivision (c), which includes unlawful sexual penetration in violation of section 289, subdivision (a), under one or more of the circumstances specified in section 667.61, subdivision (d). (§ 667.61, subds. (a), (c)(5), (d).) The jury found true one of these specified circumstances, i.e., that defendant "kidnapped the victim of the present offense and the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying offense . . . ." (§ 667.61, subd. (d)(2).)

This particular circumstance requires proof of "two elements: (1) a simple kidnapping (§ 207, subd. (a)); and (2) a substantial increase in the risk of harm to the victim." (*People v. Diaz* (2000) 78 Cal.App.4th 243, 246 (*Diaz*), fn omitted.)

10

Section 207, subdivision (a), states: "Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping." (§ 207, subd. (a).)

Regarding the movement necessary to satisfy the first element, "[i]t has long been the law in California that even a simple kidnapping requires movement more than incidental to the commission of an 'associated crime.' [Citations.] Consequently, . . . kidnapping within the meaning of section 667.61, subdivision (d)(2) requires movement of the victim that is more than incidental to the underlying sex offense." (*Diaz*, *supra*, 78 Cal.App.4th at p. 246.) "[M]ovement is not necessarily incidental even though it is designed to facilitate an associated crime" and it "can be incidental even though 'essential' to the associated crime." (*Id*. at pp. 246-247.) "[I]ncidental movements are brief and insubstantial, and frequently consist of movement around the premises where the incident began. [Citations.] By contrast, relatively short distances have been found not to be incidental where the movement results in a substantial change in 'the context of the environment.' " (*Id*. at p. 247.)

Regarding both elements, section 667.61, subdivision (d)(2) has been interpreted consistently with section 209, subdivision (b), which governs aggravated kidnapping. (§ 209, subd. (b)(2); *Diaz*, *supra*, 8 Cal.App.4th at pp. 245-249.) As discussed by our Supreme Court in a case cited by the People, "for aggravated kidnapping, the victim must be forced to move a *substantial distance*, the movement cannot be merely *incidental* to the target crime, and the movement must *substantially increase* the risk of harm to the victim. Application of these factors in any given case will necessarily depend on the particular facts and context of the case." (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1153 (*Dominguez*).)

In determining whether the movement of the victim substantially increased the risk of harm, "the jury must 'consider[] the "*scope and nature*" of the movement,' as well as '*the context of the environment in which the movement occurred*.' [Citations.] This standard suggests a multifaceted, qualitative evaluation rather than a simple quantitative

assessment. Moreover, whether the victim's forced movement was merely incidental to the [sexual offense] is necessarily connected to whether it substantially increased the risk to the victim. 'These two aspects are not mutually exclusive, but interrelated.' " (*Dominguez*, *supra*, 39 Cal.4th at pp. 1151-1152, quoting *People v. Rayford* (1994) 9 Cal.4th 1, 12.)

In short, "[t][he essence of aggravated kidnapping is the increase in the risk of harm to the victim caused by the forced movement." (*Dominguez*, *supra*, 39 Cal.4th at p. 1152.) The circumstances the jury should consider "whether the movement decreases the likelihood of detection, increases the danger inherent in a victim's foreseeable attempts to escape, or enhances the attacker's opportunity to commit additional crimes." (*Ibid.*) "[N]o minimum distance is required to satisfy the asportation requirement [citation], so long as the movement is substantial [citation]. [¶] Measured distance, therefore, is a relevant factor, but one that must be considered in context, including the nature of the crime and its environment." (*Ibid.*)

With these standards in mind, we consider defendant's insufficient evidence contentions. In doing so, we review "the record 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Watkins* (2012) 55 Cal.4th 999, 1019.) "We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence." (*People v. Shadden* (2001) 93 Cal.App.4th 164, 168.) Reversal "is unwarranted unless it appeals 'that upon no hypothesis whatever is there sufficient substantial evidence' " to support the jury's finding. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

## II. *Analysis*

Defendant contends there was insufficient evidence to satisfy either of the two elements of section 667.61, subdivision (d)(2). His contentions are unpersuasive because he largely ignores those aspects of the testimony of multiple eyewitnesses that provide substantial evidence to support the jury's finding.

12

Specifically, there was substantial evidence that defendant grabbed Doe on a public sidewalk along a street heavily traveled by cars and, instead of initiating his sexual assault there in the open, forcibly carried her about nine feet (or three meters) to 20 feet into bushes on a downward slope of ground that was off to the side of the sidewalk and about two feet below it, thereby at least significantly concealing them from view. Based on this evidence, we conclude a reasonable juror could conclude beyond a reasonable doubt that defendant's movement of Doe was not incidental to the charged sexual offense, was substantial, and caused a substantial change in the context of the environment, the result of which substantially increased the risk of harm to Doe.

## A. *The Movement Was Substantial*

Defendant contends he merely "plucked" Doe up, "hefted her sideways one or two paces and then dropped her face-forward onto the ground; the only additional movement coerced by [defendant] was to flip her over before he committed his act of penetration." He acknowledges that Herbert Ayers referred to a "tumble into the bushes" (which defendant characterizes as a "generic reference"), Kimberlee Ayers testified that the bushes were in a down slope and a "bit concealed," Doe referred to being moved two to three meters by defendant, and McNeil estimated the movement as 20 feet backwards and 6 feet off the road. According to defendant, "[u]nder these circumstances, no version of the facts (including the one involving the "twenty critical feet" [as referred to by the prosecutor]) is sufficient to support the verdict." Defendant contends "the movement was intrinsic for the offense which occurred: to beat [Doe's] face, or solicit oral sex or flip her and penetrate her vagina, [defendant] had to tackle her, and her movement of a few feet in the process would appear to be incidental to it."

Defendant's contentions ignore significant, substantial evidence to the contrary. Doe, for example, testified that when defendant picked her up off the ground and carried her backwards it seemed to her he "wanted to take me towards the bushes." He then threw her "against the bushes" in a dark area located on a downward slope of ground. This downward slope was later measured by Deputy McNeil as dropping about two feet

13

from the walkway. Denise Ferguson and John Buergler also provided testimony indicating this area sunk below the sidewalk.

Defendant cites testimony by Kimberlee Ayers to indicate the concealment was only "a bit," but ignores other testimony, including from Kimberlee, that the concealment of Doe was complete, or at least significant. Kimberlee testified that after she saw a man and a woman go into some bushes, she could not see "anything that was happening" between them. A man then "popped out" of the bushes and Kimberlee assisted Doe "in getting up out of the bushes," from an area that she only then indicated was "a bit concealed."

Herbert Ayers testified that after he saw the two fall into some bushes, he got out of the car and ran over to the area of the incident, but could not see what was going on between the two people because "they were in the bushes, so really couldn't tell what was happening." Herbert said his wife helped Doe "out of the bushes," which was when he saw that Doe's face was "just totally bloody."

Norma Garcia indicated she first noticed only that Doe's son was in his stroller alone on the Hearn Avenue sidewalk. She did not notice any struggling until a woman by the stroller directed her to look in the area of the assault and, even then, could only see defendant's black clothing on top and bodies moving and struggling. Garcia further indicated she did not clearly observe Doe until after defendant fled, when Garcia saw Doe "getting up" and "coming outside from where she was from the bush area."

Elmer Velasco testified that after he saw two bodies "fall over by the train tracks, by some grass" he saw a man punching down on someone else in some tall grass, but could not see who was underneath the man.

A reasonable juror could rely on this evidence to conclude beyond a reasonable doubt that defendant deliberately moved Doe from a public sidewalk easily viewed by passerby's to a dark, concealed area inside some bushes that facilitated his unlawful sexual penetration of Doe. As we have indicated, "movement is not necessarily incidental even though it is designed to facilitate an associated crime" and "relatively short distances have been found not to be incidental where the movement results in a

14

substantial change in 'the context of the environment.' " (*Diaz*, *supra*, 78 Cal.App.4th at pp. 246, 247.)  No minimal distance is required.  (*Dominguez*, *supra*, 39 Cal.4th at p. 1152.)  Based on this law and the evidence we have cited, we conclude there was substantial evidence that defendant's movement of Doe, rather than be intrinsic to the sexual offense charged, was substantial and substantially changed the context of the environment in which the unlawful sexual penetration occurred.

**B.** *The Movement Substantially Increased the Risk of Harm to Doe*

Defendant also argues that "it is plain that there was no increase" in the risk of harm to Doe from defendant's actions.  Defendant contends that, "[u]nlike cases where increased risk of harm is discerned despite very minimal movement because the movement occurred indoors," "[t]he exterior location makes a significant difference in the analysis" because there was less danger of harm outside.  Among other things, defendant contends that it "simply is untrue" that the site of the offense was secluded.  He contends that photographs introduced into evidence indicate that the "camera easily was able to photograph well into the scene areas," and that the visible area of one photograph is six times the distance Doe testified she was moved off the sidewalk.  He further contends that at least four of the eyewitnesses—including Herbert Ayers and Norma Garcia—saw the struggle, and that Doe indicated she could still see her baby from the area of the assault.  He concludes, the assault area "was feet from a busy roadway and so visible that no fewer than four people were able to observe the brief incident and, by running quickly to the scene, prompt [defendant] to abate his assault  before seriously injuring the victim."

Defendant's contentions are based on his own interpretation of the evidence.  There is nothing definitive about the evidence he cites; in particular, we cannot draw his conclusion from the black and white paper copies of photographs which are contained in the record.

More importantly, defendant ignores the substantial evidence that Doe was completely, or at least significantly, concealed after defendant moved her into some bushes.  As we have already indicated, Herbert and Kimberlee Ayers saw the two as they

went into the bushes; Garcia stopped because she noticed only that Doe's son was sitting in his stroller on the sidewalk; and Velasco saw the two fall over. While Garcia and Velasco indicated they could see some aspect of the struggle, neither saw Doe clearly until after the assault was completed. While Garcia, once pointed to the location of the assault, heard Doe's screams, defendant was able to punch Garcia 10 to 15 times in his efforts to silence her. Most importantly, the Ayers both testified that they could not see what occurred after the two went into the bushes, which was substantial evidence that defendant's physical concealment of Doe was complete. Also, there was no evidence these witnesses stopped because of what they witnessed or heard *after* defendant took Doe into the area of the assault.

Furthermore, defendant's relatively short movement of Doe did not necessarily make it less dangerous. "[W]here a defendant moves a victim from a public area to a place out of public view, the risk of harm is increased even if the distance is short." (*People v. Shadden*, *supra,* 93 Cal.App.4th at p. 169 [defendant moved rape victim from front area of a store in public view nine feet into a closed back room].)

Defendant's characterization of the evidence, and his relative disregard of material, inculpatory aspects of testimony by multiple witnesses, in effect asks us to reweigh the evidence in his favor. This is not within our province when applying a substantial evidence standard of review. (*People v. Martinez* (2003) 113 Cal.App.4th 400, 412.) We conclude there was substantial evidence from which a reasonable juror could conclude beyond a reasonable doubt that defendant's movement of Doe substantially increased the risk of harm to her over and above that level of risk necessarily inherent in his unlawful sexual penetration of her.

**C.  *Supporting Case Law***

Defendant's arguments, particularly that the outdoor location of his assault makes a significant difference in the analysis, are fatally undermined by three cases cited by the People.

In *Dominguez,* defendant, in the middle of the night, forced the victim to move from the shoulder of a road, down a 10- to 12-foot embankment, and partially into a

16

walnut orchard about 25 feet away from the road. (*Dominguez*, *supra*, 39 Cal.4th at pp. 1150-1151.) Because of the embankment's steepness and orchard's trees, it was unlikely a driver on the road could see the victim where she was moved. (*Id*. at p. 1153.) Thus, despite the short distance, our Supreme Court found, the movement "changed the victim's environment from a relatively open area alongside the road to a place significantly more secluded, substantially decreasing the possibility of detection, escape or rescue." (*Ibid.*) The court concluded that, "considering the context of the forced movement of the victim . . . and viewing the evidence in the light most favorable to the People," there was sufficient evidence that the movement was more than incidental to the commission of the rape involved and substantially increased the risk of harm to the victim over and above that necessarily present in its commission. (*Id*. at p. 1155.)

Similarly, in *People v. Aguilar* (2004) 120 Cal.App.4th 1044 (*Aguilar*), the defendant, Aguilar, forcibly moved his victim 133 feet down a sidewalk at night, from an area illuminated by a porch light to "an 'extremely dark' area," where he pulled her down the sidewalk, threw her to the ground, grabbed her neck, choked her, bit her, slammed her onto a car hood, held her face down and held a knife near her neck. (*Id*. at p. 1049.) He also put his hands down her pants and inserted his fingers in her vagina. (*Id*. at p. 1047.) A resident in the area heard the victim's screaming and turned on his porch light. (*Ibid*.) He saw Aguilar attacking the victim and told him to release her; Aguilar got up and ran, but was shortly apprehended by the resident and the resident's brother. (*Ibid*.)

The *Aguilar* court concluded these facts were sufficient to sustain the jury's conclusion that defendant had committed aggravated kidnapping because the movement decreased Aguilar's likelihood of detection, and a reasonable trier of fact could infer this increased the risk to the victim by making it harder for her to escape and enhanced Aguilar's opportunity to commit further crimes. (*Aguilar*, *supra*, 120 Cal.App.4th at p. 1049.) Furthermore, " '[a]n increased risk of harm was manifested by appellant's demonstrated willingness to be violent . . . .' " (*Ibid*.)

The defendant in *Diaz* demanded property from a woman standing at a bus stop in the early morning darkness, by a lighted intersection. (*Diaz*, *supra*, 78 Cal.App.4th at p.

248.)  When the woman said she had none, the defendant forced her toward a nearby park.  Before reaching there, he pushed her to the ground in a grassy area next to the sidewalk, but when a passerby stopped her car and said something, he covered the victim's mouth, pushed her up a stairway, into the park, and around to the back side of a large recreation center building, where it was completely dark, and sexually assaulted her.  (*Ibid*.)  An officer summoned by the passerby could not see the defendant and the victim in the darkness, but located them based on the victim's cries, and detained defendant.  (*Ibid*.)  The victim was moved at least 150 feet, and perhaps twice that distance or more.  (*Ibid*.)

The *Diaz* court concluded these facts more than adequately supported the jury finding that the movement of the victim was substantial.  It noted that the defendant "could have sexually assaulted the victim in the sidewalk area where he first accosted her; indeed, he was in the process of doing so until distracted by the passing citizen.  He quite obviously moved the victim in order to complete the attack and avoid detection.  The scope and nature of the movement dramatically changed the environmental context." (*Diaz*, *supra*, 78 Cal.App.4th at p. 248.)  The court also concluded this movement created a substantial risk of increased harm to the victim.  It stated, "We can only speculate as to what would have become of the victim had the passing citizen not taken prompt action, and had the police response not been quick.  Clearly, the risk to the victim in the dark and isolated location of the attack increased significantly as compared to the lighted sidewalk near the bus stop where the incident began." (*Id*. at p. 249.)

The present circumstances are similar to the facts in each of these three cases.  As we have discussed, substantial evidence indicated defendant moved Doe from a public sidewalk to a dark, significantly or totally concealed area inside some bushes, thereby substantially changing the context of the environment so as to reduce the risk of detection.  Each of the three cases involved incidents that occurred outside and involved movement of relatively short distances, as little as 25 feet, to a darkened area in the vicinity of the initial encounter.  Indeed, Aguilar remained out in the open; the context of the environment changed only because he moved from a lit to an unlit area.  *Diaz*

18

involved vegetation analogous to the bushes in the present case—orchard trees—that, the court concluded, partially, but significantly, concealed the victim and her attacker from drivers going by, substantially reducing the risk of detection.

Also, like Doe, the victims in *Aguilar* and *Diaz* could be heard screaming. However, this did not alter that their movement was substantial and substantially increased the risk to them over and above that necessary for the commission of the crimes involved.

Furthermore, *Aguilar* involved a risk of harm that was manifested by the attacker's willingness to be violent, even though he was in an open area and was seen by a neighborhood resident who turned on his porch light. A reasonable juror could conclude defendant's willingness to be violent in the present case, punching Doe 10 to 15 times, manifested the same risk.

Defendant argues that *Diaz* actually supports his position because, as the *Diaz* court noted, movement of the victim "from the sidewalk to the grassy strip could easily be characterized as incidental, in that it effected no substantial change in the surroundings, and may have been a short distance from where defendant first made contact with the victim." (*Diaz*, *supra*, 78 Cal.App.4th at p. 248-249.) Defendant contends the circumstances here are practically the same. We disagree. There was no indication in *Diaz* that the grassy strip created any concealment or other change in the environment, unlike the present case.

In short, based on substantial evidence, we conclude that a reasonable juror could conclude beyond a reasonable doubt that defendant moved Doe from a public sidewalk to inside some bushes, thereby significantly or completely concealing them from passersby, substantially increasing the risk of harm to her. A reasonable juror could conclude beyond a reasonable doubt that this movement decreased the likelihood of detection, increased the danger inherent in Doe's attempts to escape, and enhanced defendant's opportunity to commit additional crimes. Whether or not these dangers fully materialized " 'does not, of course, mean that the risk of harm was not increased. [Citations.]' "

19

(*People v. Martinez* (1999) 20 Cal.4th 225, 233.)  Defendant's appellate claim lacks merit.

## DISPOSITION

The judgment is affirmed in its entirety.

_____
Brick, J.*

We concur:

_____
Kline, P.J.

_____
Haerle, J.

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.